## GRANT et al. v. EAST & WEST R. CO. OF ALABAMA et al.

(Circuit Court of Appeals, Fifth Circuit. February 6, 1893.)

### No. 45.

1. RAILROAD COMPANIES—STOCK—PAYMENT IN PROPERTY—OVERVALUATION.

Code Ala. 1876, § 1824, requires subscriptions to railroad stock, which are payable in labor or property, to be taken at their money value, which must be stated in the subscription list. A railroad company adopted a resolution to sell all its property to another company for $750,000, one half in stock and one half in bonds of the purchaser, and subsequently entered a subscription for $375,000 of stock, "to be paid for in the railroad property" of the seller, "of the value of the said sum of $375,000."

*Held,* that the subscription was to be read in connection with the resolution, and its language was not conclusive that the value of the entire property was not over $375,000, so as to render void the issue of $375,000 in bonds under the constitutional provision forbidding overcapitalization.

2. SAME—BONDS.

Under Const. Ala. art. 14, § 6, forbidding corporations to issue stock or bonds except for money, labor, or property actually received, and declaring all fictitious increase of stock or indebtedness void, and Code Ala. 1876, § 1824, requiring that all subscriptions to the stock of railroad companies shall be paid in money, labor, or property at their money value, railroad property sold by one company to another and paid for by an issue of stock and bonds may be valued according to its net earning power, and the cost of building it de novo, and it is immaterial that the seller originally acquired it for much less than its actual value. 52 Fed. Rep. 531, affirmed.

3. CORPORATIONS—CAPITAL STOCK—RIGHTS OF CREDITORS.

Although unpaid subscriptions to the capital stock of an insolvent corporation constitute a trust fund for the payment of its debts, yet where the corporation law of a state allows subscriptions to be paid in property other than money, such payment in good faith at an honest valuation puts an end to the trust. A gross overvaluation of the property thus received would, however, be strong evidence of fraud in an action to enforce the personal liability of the stockholder.

In Equity. Bill by the American Loan & Trust Company of New York, for which George S. Coe was substituted pending the suit, against the East & West Railroad Company of Alabama, James W. Schley, Joel Brown, and S. I. Stevens, for the foreclosure of a mortgage. Frederick and James Grant, doing business under the name of Grant Bros., filed an auxiliary and dependent bill against the same respondents and others, to declare void certain bonds, and foreclose the mortgage for the benefit of the holders of other bonds. For prior opinions, see 37 Fed. Rep. 242; 40 Fed. Rep. 182, 384; 46 Fed. Rep. 102. The auxiliary bill was dismissed, and the mortgage foreclosed for the equal benefit of all bondholders. 52 Fed. Rep. 531. A motion to dismiss the appeal of Grant Bros. was denied. 50 Fed. Rep. 795, 1 C. C. A. 681. The appeal is now on final hearing. Affirmed.

Pat Calhoun, Jack J. Spalding, and Alex. C. King, for appellants.

Wager Swayne, Robt. Ludlow Fowler, and Frank Sullivan Smith, for appellees.

Before McCORMICK, Circuit Judge, and LOCKE and BILLINGS, District Judges.

McCORMICK, Circuit Judge. On the 2d day of June, 1888, the American Loan & Trust Company of New York, a corporation created under the laws of New York, exhibited its bill in the United States circuit court for the southern division of the northern district of Alabama against the East & West Railroad Company of Alabama, a corporation created under the laws of Alabama, and against James W. Schley, a citizen of Georgia, and Joel Brown and S. I. Stevens, citizens of Alabama, for the foreclosure of a certain consolidated mortgage made by said railroad company in favor of complainant as trustee to secure an issue of bonds to the extent of $15,000 to the mile of completed road owned and built or to be built by said railroad

company, making the usual allegations as to the issuance of bonds thereunder, default in the payment of interest, the request of the bondholders and the condition of the property, which devolved on complainant the duty of seeking in the court a decree of foreclosure of said mortgage for the equal benefit of the holders of any or all of said bonds. The bill further showed that the complainant "is informed that the entire series of bonds secured by the said mortgage or deed of trust were issued and put upon the market in due course of business, and that the same are entitled to the benefit of the said mortgage, but yet so it is that some person or persons will and do claim adversely to some of the said bonds, and make claims unknown to your orator, the nature and validity of which claims your orator cannot and ought not to determine, and therefore submits the same to the honorable court for its final adjudication in the premises."

On July 26, 1888, the appellants, Grant Bros., petitioned to become a party to said suit, and to be allowed to file "an auxiliary and dependent bill," and leave being granted, filed their "auxiliary and dependent bill" against the said railroad company and the said trust company and against William C. Browning, Edward F. Browning, Eugene Kelly, and James Byrne, citizens of New York, J. Hull Browning, a citizen of New Jersey, and Amos G. West, a citizen of Georgia. The bill is long, and it is not necessary to give its details. It charges, in substance, that there are outstanding 734 bonds, of which said Grant Bros. hold 30 issued under said consolidated mortgage, which are now in the hands of innocent holders for value, without notice of any defect in them, and which are entitled to benefit under said mortgage. That default has been made in the payment of interest, and a decree of foreclosure should pass for the benefit of these holders, but that the defendants Brownings and West and Kelly and Byrne claim to hold or own some interest in 966 bonds, and the said trust company claims to own 50 bonds purporting to have been issued under said mortgage, which are not valid, and are not entitled to the benefit of the foreclosure of said mortgage, for that the bonds for which these 966 bonds and these 50 bonds were given were issued by said railroad company fraudulently and without consideration to the Brownings and West, of which Kelly and Byrne and the trust company had full notice. That under color of a contract between the said railroad company, of which the said Brownings and West were then shareholders and controlling directors and officers, with a corporation known as the Cherokee Iron Company, the stock in which was all owned by said Brownings and West, said Brownings and West, in the name of said iron company, subscribed for 3,750 shares of the capital stock of said railroad company, $375,000, to be paid for in the railroad property of the Cherokee Railroad Company of Georgia, of the money value of said sum of $375,000. That all of the railroad property of the Cherokee Railroad Company of Georgia was not of greater money value than the said sum of $375,000, but that said East & West Railroad Company of Alabama, in addition to satisfying said subscription to its stock by the receipt of said railroad property, issued to said Cherokee Iron Company its first mortgage bonds to the par value of $375,000, and at the same time said East

& West Railroad Company made a contract with one Michael Duff, who is charged by appellants to have been a mere figurehead for Brownings and West, to extend its road, in connection with which contract said Duff subscribed for 238 shares,—$23,800,—to be paid for in labor of the money value of said sum of $23,800, and for 5,750 shares,—$575,000,—to be paid for in labor on and property necessary in constructing and equipping the railroad of the East & West Railroad Company of Alabama, said labor, property, and equipment to be of the money value of said sum of $575,000, which said two subscriptions of stock by said Michael Duff more than equaled in par value the real money value of all the labor, property, and equipment furnished said East & West Railroad Company of Alabama under said contract with said Michael Duff; and yet, in addition to satisfying his said subscription for stock by the receipt of the newly-constructed road and equipments, said defendant railroad company issued therefor 734 of its first mortgage bonds, all of which 734 bonds and said 375 bonds, in all 1109 first mortgage bonds, went into the hands of said Brownings and West without consideration, in violation of the laws of Alabama, and in fraud of the rights of subsequent creditors. That said Michael Duff's subscription for stock and contract for construction was speedily transferred to a so-called Southern Railroad Construction Company, which is alleged to be only another name for said Brownings and West, and that said Brownings and West claim that said defendant railroad company was indebted to them for money borrowed of them to loan to said construction company, and for other advances made, and for interest on same, and for unpaid matured interest coupons on said first mortgage bonds, amounting in all to $325,000, and for this pretended debt, which they called the "floating debt," said defendant railroad company issued to said Brownings and West 500 certain debenture bonds at 65 cents on the dollar. That these said first mortgage bonds and said debenture bonds were afterwards substituted by said consolidated mortgage bonds and 966 of these still are held by said Brownings and West, or by Kelly and Byrne as their assigns, charged with notice, and 50 are held by said trust company, charged with notice, of the fraudulent character of said bonds. That, in order to unload these fictitious and fraudulent bonds on the public, said Brownings and West made false representations to the New York Stock Exchange, and procured the listing of said bonds on said exchange, and caused simulated sales of said bonds to be quoted as made thereof on said exchange at a premium, whereby appellants and their fellow bondholders, for value, without notice, were induced to invest in said bonds. Wherefore they pray that only they and other holders similarly situated, as innocent purchasers, without notice, of said bonds, be allowed the benefit of said foreclosure, and that all of said other bonds be decreed to be fictitious, fraudulent, and void.

All the equities urged in this auxiliary bill were fully denied by the several answers of the different defendants thereto, and the whole suit progressed according to the usual course in such proceedings. On October 22, 1891, the whole case came on for hearing in the said circuit court, and on the 12th of March, 1892, said court ren-

dered its decree foreclosing said consolidated mortgage for the equal benefit of the holders of any or all of said consolidated bonds, denying all the relief prayed for in the auxiliary bill, and dismissing said auxiliary bill, with costs. From this decree James Grant and Frederick Grant, composing the firm of Grant Bros., prosecuted this appeal. They have assigned well-prepared separate specifications of error touching the action of the circuit court on the various features of their bill, substantially to the effect that the circuit court erred in denying them the relief for which they prayed, because the proof showed that the 375 first mortgage bonds issued for the purchase or lease of the Cherokee Railroad, and the 734 first mortgage bonds issued for the extension of the road under the Michael Duff contract, and the 500 debenture bonds issued to Brownings and West for the so-called "floating debt," were all fraudulently issued, without any legal consideration therefor, and in violation of the constitution and laws of Alabama, in which frauds the present holders of said 966 consolidated bonds participated, or of which they are chargeable with notice; and because the proof shows that the appellants, and those in like situations with them, were induced to purchase the bonds held by them by the listing of said bonds on the New York Stock Exchange, and that said listing was procured by the false statements and representations made by E. F. Browning, acting for himself and for J. H. Browning and A. G. West, and as president of the defendant railroad, of which the other defendants are chargeable with full knowledge.

The Cherokee Iron Company was a Georgia corporation, incorporated by a special charter, operating a furnace at Cedartown, and entirely owned by Messrs. Brownings and West. It was authorized to buy and extend any railroad leading to its furnace at Cedartown. The Cartersville & Van Wert Railroad Company, a corporation created under an act of the assembly of the state of Georgia, had completed a railroad from Cartersville, in Georgia, to Rockmast, a distance of about 24 miles, and had completed the grade for said road to Cedartown. This railroad the Cherokee Iron Company purchased for $22,500, and extended it to Cedartown, and changed its corporate name to the Cherokee Railroad Company. To perfect the title to this road, and to restore, extend, and equip it from Cartersville to Cedartown, cost something over $350,000 in money, which money was furnished almost entirely by the Brownings. After this, on the 14th of February, 1882, the East & West Railroad Company of Alabama, one of the appellees, was incorporated under the general laws of the state of Alabama, with an authorized capital stock of $50,000, of which at that time $26,200 had been subscribed. The three Brownings and West had subscribed $1,000 each, and were, with three others, elected directors, and E. F. Browning was elected president, A. G. West, vice president, J. Hull Browning, treasurer, and M. R. Crow, who had subscribed $20,000 of the $26,200 of the stock then subscribed, was elected secretary, and held that place until some time in the year 1883. On June 17, 1882, the stockholders of the East & West Railroad Company of Alabama met and increased the capital stock of said company from $50,000 to $1,000,000.

On the 25th of October, 1882, the Cherokee Iron Company passed this resolution:

"Resolved, that this company subscribe for $375,000 of the capital stock of the East and West Railroad of Alabama, to be paid for in the property named, by delivering to said East and West Railroad Company of Alabama the railroad property now known as the Cherokee Railroad, including the railroad, stock, franchises, rights, and property of every description, and telegraph lines connected therewith, with a lease by this company for ninety-nine years at an annual rent of one dollar, with privilege of renewal for ninety-nine years at the same rent, at the price of $750,000,—$375,000 thereof for said capital stock, as subscribed for, and the remaining $375,000 to be paid by the said East and West Railroad Company of Alabama in bonds or obligations of the denomination of $1,000 each, having thirty years to run, bearing interest at six per cent., payable semiannually, and secured by a first mortgage on the property and franchises of said East and West Railroad Company of Alabama, including said lease. Resolved, that the president of this company be, and is hereby, authorized on behalf of this company to subscribe for said stock on the terms above stated, and to execute, seal, and deliver all contracts, agreements, and other writings."

On November 6, 1882, the Cherokee Iron Company made its subscription to the stock of the defendant railroad company in these words:

"Ashville, Ala., November 6, 1882. The Cherokee Iron Company, per J. K. Barbour, Secretary, Cedartown, Georgia, 3,750 shares; amount, $375,000, to be paid for in the railroad property of the Cherokee Railroad Company of Georgia, of the value of said sum of $375,000."

On the same day that this subscription was made the defendant railroad company also passed resolutions formally accepting the sale of this Cherokee Railroad for a consideration of $375,000 in the stock of the defendant railroad company, as subscribed for, and $375,000 in its first mortgage bonds, and the necessary instruments were afterwards duly executed to that effect. These resolutions of the Cherokee Iron Company, its subscription to the stock of the defendant railroad company, and that company's resolutions formally accepting the sale of the Cherokee Railroad were, under the evidence in this case, viewed by the circuit court as one contract, the evidence of one transaction, not a sale for stock more than for bonds, but in reality for both. The constitution of the state of Alabama (article 14, § 6) prescribes:

"No corporation shall issue stock or bonds except for money, labor done, or money or property actually received, and all fictitious increase of stock or indebtedness shall be void."

Section 1824 of the Code of Alabama (1876) provides:

"All subscriptions to the capital stock of any railroad proposed to be organized under the provisions of this article shall be taken payable in money, labor, or property at their money value, to be named in the list of subscriptions, and, in the event of the failure to perform the labor and deliver the property according to the terms of the subscription, the subscriber shall be bound to pay the amount named in the subscription list in money."

Appellants do not seek in their suit to recover on behalf of the defendant railroad company any amount remaining unpaid of the subscription to the stock. They have not made the said Cherokee Iron Company a party to their suit. Their contention is that, by the terms of said subscription, the value of the railroad property

of the Cherokee Company is fixed at $375,000, exactly equal to the stated value of the stock subscribed; that said subscription, therefore, fully paid for said property, and left no consideration to support the issue of said 375 first mortgage bonds. The language of the memorandum of said subscription of stock would not clearly support this contention if it stood alone, and, when read in connection with the resolutions of the company authorizing said subscription to be made,—as we are of opinion it must be read,—this contention finds no support. Appellants contend further, that if the value of said property is not so limited by the very terms of the subscription, in point of fact said property was not worth more than $375,000, and that the taking of it at double that price, payable in equal amounts of stock and bonds of said company, was illegal under the Alabama laws, and, by absorbing into said bonds the full real value of the property secured on said subscription, worked a fraud on the rights of subsequent creditors, for whose protection that stock of the company and its proceeds constituted a trust fund independent of any state, organic, or statute law.

It has long been the settled doctrine in the United States courts that the capital stock of an insolvent corporation is a trust fund for the payment of its debts; that the law implies a promise by the original subscribers of stock who do not pay for it in money or other property to pay for the same when called upon by creditors; and that a contract between themselves and the corporation that the stock shall be treated as fully paid and nonassessable, or otherwise limiting their liability therefor, is void as against creditors. Sawyer v. Hoag, 17 Wall. 610; Upton v. Tribilcock, 91 U. S. 45; Sanger v. Upton, Id. 56; Webster v. Upton, Id. 65; Chubb v. Upton, 95 U. S. 665; Pulman v. Upton, 96 U. S. 328; Graham v. Railroad Co., 102 U. S. 148–161; Hawkins v. Glenn, 131 U. S. 319, 9 Sup. Ct. Rep. 739.

And the trust arising in favor of creditors by subscriptions to the stock of a corporation cannot be defeated by a simulated payment of such subscription, nor by any device short of an actual payment in good faith. Camden v. Stuart, 144 U. S. 104, 12 Sup. Ct. Rep. 585. This well-settled doctrine of the general law relating to subscriptions to the stock of corporations as announced by the United States supreme court in the cases above cited has been embodied in the constitutions and codes of many of the states; and issues of stocks and bonds, under constitutional and statutory provisions substantially similar to those of Alabama, have been sustained when they have been disposed of by a corporation after its organization for the best price that could be obtained, though for less than their face value. Railroad Co. v. Thompson, 103 Ill. 187; Railroad Co. v. Dow, 120 U. S. 287, 7 Sup. Ct. Rep. 482; Handley v. Stutz, 139 U. S. 417, 11 Sup. Ct. Rep. 530; Clark v. Bever, 139 U. S. 96, 11 Sup. Ct. Rep. 468; Fogg v. Blair, 139 U. S. 118, 11 Sup. Ct. Rep. 476.

When the charter of a corporation or the general law under which it is created authorizes the capital stock to be paid for in property, and the shareholders honestly and in good faith pay for their subscriptions in property instead of money, there is an end of trust in favor of anybody, and third parties, even subsequent creditors,

have no ground of complaint, although a gross and obvious overvaluation of such property would be strong evidence of fraud in an action by a creditor to enforce personal liability. Coit v. Gold Amalgamating Co., 119 U. S. 343, 7 Sup. Ct. Rep. 231.

The provisions of the constitution and the Code of Alabama, relied on by the appellants in this case, have been the subject of construction by the supreme court of that state in a number of cases, and the result of their decisions is well stated in the opinion of the judge who passed the decree from which this appeal is taken:

"In cases of subscription to the capital stock of incorporated companies in Alabama, payable in property, in order to release the subscribers from liability to creditors, there must be no fraudulent valuation of the property, no deliberate nor intentional overvaluation. The property delivered in payment must be of a value to correspond with that named in the subscription. There must be more than a formal or illusory compliance with the law. There must be a fair exercise of judgment and discretion, honestly directed, to secure a substantial compliance with the law." Grant v. Railroad Co., 52 Fed. Rep. 531; Fitzpatrick v. Publishing Co., 83 Ala. 604, 2 South. Rep. 727; Williams v. Evans, 87 Ala. 725, 6 South. Rep. 702; Elyton Land Co. v. Birmingham Warehouse & Elevator Co., (Ala.) 9 South. Rep. 129; Nelson v. Hubbard, (Ala.) 11 South. Rep. 432.

The property of the Cherokee Railroad Company embraced a line of operative railroad 37½ miles in length, equipped for operation, well located for securing and doing business, then doing a thriving trade, out of which it was making, and for several successive years had been making, net earnings to the amount of near $40,000 a year. Its original promoters and managers had expended on it several hundred thousand dollars. It was acquired by the Cherokee Iron Company under such circumstances as enabled that company to get it at a bid which it can hardly be seriously contended measured its real worth or intrinsic value to a purchaser able and willing to complete it and operate it. There could be no fraud or badge of fraud in such a purchaser claiming the benefit of his bargain, and valuing his property, when repaired and extended, according to its capacity to make net earnings, and according to what it would cost to build and equip such a road, then and there, if it had never been built, and the right of way had yet to be acquired, and the road built from the stump. On this subject it can hardly be claimed that the testimony is conflicting. To an impartial mind accustomed to weighing evidence the overwhelming weight of the proof shows that the property was worth more than $375,000. And after a careful study of all the evidence offered we fully concur in the finding of the judge who heard the case at the circuit that "the weight of the testimony of experts and of others acquainted with the property is to the effect that the Cherokee Railroad was not overvalued."

Most of what we have said in reference to the subscription by the Cherokee Iron Company applies with equal force to the Michael Duff subscription and construction contract. A multitude of competent and credible witnesses testify to the intrinsic fairness of these transactions, and, like the trial judge, we "find no evidence in the record * * * to the contrary, * * * and it seems there was a fair exercise of judgment and discretion on the part of the railroad com-

pany, fairly and honestly directed, to secure a substantial compliance with the law of Alabama." It follows that the transaction between the defendant railroad company and the Brownings by which the debenture bonds were acquired was entirely just and lawful, for the only semblance of a serious contention as to them rests on the complainants' mistaken view as to the subscriptions of stock and the issue of the first mortgage bonds.

It remains only to notice the contention of appellants that they and their fellow bondholders were induced to take the bonds held by them by false and fraudulent representations made by E. F. Browning, by which he, or Grovesteen & Pell, got said bonds listed on the New York Exchange, of which the defendants all had knowledge, or are chargeable with knowledge. The trial judge, after fully stating all the testimony on that subject, concludes that the evidence is not sufficient to show that the appellants, or any person similarly situated, bought said bonds held by them on any representations the Brownings had made either to procure the listing of the bonds or otherwise. In this finding of his we fully concur.

It is unnecessary to consider other features of the case, as what has already been concluded requires that the decree of the circuit court be, and it is, affirmed.

PARDEE, Circuit Judge, having sat in the circuit court rendering the decision appealed from, took no part in the hearing and decision of this appeal.