LAKE ST. EL. R. CO. v. ZIEGLER et al.

ZIEGLER et al. v. LAKE ST. EL. R. CO.

(Circuit Court of Appeals, Seventh Circuit. January 17, 1900.)

Nos. 536, 552.

1. REMOVAL OF CAUSES—DIVERSITY OF CITIZENSHIP—JOINDER OF FORMAL PARTIES.

A corporation brought a suit in equity in a state court against persons alleged to be the holders of certain of its stock and bonds, who were all citizens and residents of other states, to obtain an accounting, and the surrender of such stock and bonds, on the ground that they had been obtained by one of the defendants, who was a director of complainant, in fraud of its rights. The bill also alleged that defendants had made a demand on the trustees in the trust deed securing the bonds in suit, with others, for the foreclosure of such trust deed, and made the trustees, one of whom was a citizen of the same state as complainant, parties defendant for the purpose of obtaining an injunction restraining such foreclosure. Held, that the trustees were not indispensable, but merely formal, parties, having no interest in the controversy, and that their joinder did not deprive a federal court of jurisdiction of the suit, which was removable by the individual defendants.

2. EQUITY—HEARING—RIGHT OF PARTIES TO DECISION ON THE MERITS.

Where both parties to a controversy are before the court, and a full hearing has been had upon their respective claims, the suit should be determined on the merits, and it is error to dismiss it without prejudice against the wishes of both parties.

3. RAILROAD CORPORATIONS—STATE REGULATION—ISSUANCE OF STOCK.

The provision of Const. Ill. art. 11, § 13, that no railroad corporation shall issue any stock or bonds except for money, labor, or property ac-

tually received and applied to the purposes for which such corporation was organized, and that all stock dividends and other fictitious increase of the capital stock of any such corporation shall be void, does not render invalid stock issued by a railroad company, directly or indirectly, in payment for the construction of its road; nor can a court hold it invalid on a determination that the consideration so received was not equal to the par value of the stock.

**4. SAME.**

The issuance of stock by a railroad corporation in violation of such provision is ultra vires, and the stock void in the hands of all holders, and the corporation cannot maintain a suit against the person to whom it was issued to require an accounting for its proceeds.

**5. SAME—RIGHTS OF MINORITY BONDHOLDERS.**

A court of equity will not, at the suit of a corporation, compel its minority bondholders to assent to a reorganization scheme by which they are required to scale their bonds, accepting in lieu thereof new bonds for a smaller amount, without additional security; the benefits of the scheme, if any, inuring solely to the stockholders.

Appeal and Cross Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

On December 31, 1895, the Lake Street Elevated Railroad Company, a corporation of the state of Illinois, the appellant in the first and the appellee in the second of these causes, filed its bill, and on the 16th day of January, 1896, filed its amended bill, in the circuit court of Cook county, Ill., against the appellants. William Ziegler and 12 other individual defendants, each being a citizen of a state other than the state of Illinois, the Farmers' Loan & Trust Company, a corporation of the state of New York, and the American Trust & Savings Bank, a corporation of the state of Illinois, the two last-named corporations being trustees in the trust deed executed by the appellant. This bill sought to charge William Ziegler, one of the defendants, and who was a director of the Lake Street Elevated Railroad Company, with certain bonds and stock received by him from the contractors who constructed the road, upon the ground that he, being a director, was interested in the contract which the company, with his participation, had made with the contractors, and which was improvident; and that he was interested with the contractors in the profits to be made. These charges having been, at the hearing, abandoned by the complainant below, it is not necessary to state them in detail. The other individual defendants were charged to have received bonds from Ziegler with notice of the facts charged in the bill, or to hold them in secret trust for him. The amended bill charged that Ziegler and the other individual defendants had demanded of the trustees that, by reason of default in payment of interest upon the bonds held by them, respectively, they should take possession under the trust deed, or proceed to foreclose it, which the complainant feared would be done by the trustees upon such demand by reason of their ignorance of the facts stated in the bill. The prayer of the bill was that an accounting might be had between the complainant and the individual defendants, and that, upon payment by the complainant of the amount paid by Ziegler to the contractors for the bonds and stock now held by him and the other individual defendants, such bonds, stock, and other property, if any, should be surrendered to the complainant, it offering to pay the amounts paid by Ziegler therefor. The bill also prayed for an injunction pendente lite restraining disposition of the bonds and stock held by the individual defendants, and from commencing suit at law or in equity upon the bonds or coupons pertaining thereto, and from collecting the interest due thereon; and that the trustees might be enjoined from taking possession of the road and from foreclosure of the trust deed at the request of the individual defendants. At the commencement of the suit a temporary injunction was allowed as prayed, but process was not served upon the defendant. On the 22d day of January, 1896, the individual defendants filed their petition for the removal of the suit into the circuit court of the United States for the Northern district of Illinois upon the ground that the suit was a controversy wholly between citizens of different states, to wit, a controversy between the complainant, an

Illinois corporation, on the one hand, and Ziegler and the other individual defendants, citizens of states other than the state of Illinois, on the other hand, and which could be fully determined as between them. An order was thereupon entered by the state court, removing the cause into the federal court. The individual defendants, other than Ziegler, answered, setting forth their respective holdings and bonds, and asserted themselves to be bona fide holders, for value, and without notice of the facts set forth in the amended bill. The defendant Ziegler also answered fully, denying the equity of the bill, and asserting his holdings and the sources thereof.

The facts, so far as they are necessary to be stated to present the questions submitted to the court, are these: The Lake Street Elevated Railroad Company was incorporated in the month of August, 1892, with a capital stock of $5,000,000, for the purpose of constructing and operating an elevated railway some seven miles in length, and within the city of Chicago. Prior to December, 1892, the company had issued $3,500,000 of its stock. It had constructed one mile of its railway. It had issued $812,000 of bonds, the proceeds of which presumably had been used in the construction of the one mile of road. The company was in straitened circumstances, and unable to proceed further with the construction of the railway. The enterprise was moribund. Under these circumstances the directors applied themselves to the task of devising plans for the completion of the road. On December 23, 1892, William Ziegler, a resident of New York, was elected a director of the road, and took his seat as director at a meeting of the board on the 2d day of February, 1893. On September 1, 1892, one Miller, a law clerk, financially irresponsible, subscribed for $1,500,000 of unissued stock. On February 3, 1893, this subscription was approved by the directors, who agreed to receive in payment thereof the notes of Miller, dated September 23, 1892, payable at six months and one year from their date, upon the condition that those who should become contractors for the construction of the road would agree to take these notes of Miller in part payment of the work to be done. This condition was afterwards carried into effect, the notes were delivered to the company and received in payment by the contractors, and the stock was issued to Miller; and presumably this stock passed to the contractors from Miller, the transaction being a device for the issue of stock, and being resorted to, probably, because the subscription of Miller antedated by some months the letting of the contract. Negotiations were entered upon in the fall of 1892 with Underwood and Green for the construction and equipment of the road. At a meeting of the directors of the company held on February 3, 1893, the committee of the board having the matter in charge reported, and proposals were submitted to and considered by the board. On the 4th day of February, 1893, a contract was agreed upon with Underwood and Green as follows: They were to build and equip the road, and were to receive in payment thereof $11,710,000, of which $6,500,000 was to be in the capital stock of the company at par, $5,150,000 in the first mortgage bonds of the company at par, and $60,000 in cash,—an amount received by the company from one Wheeler upon subscription to stock, which was to be considered as a part of the fund provided to be paid for the expenses of the company during the time of construction, but the directors might use any part of it to pay bills for the construction of the road. It was further arranged that an underwriting agreement should be made to aid the contractors in their work. By this agreement bonds and stock were to be deposited in trust and monthly estimates should be had as the work progressed, and a proportionate amount of bonds and stock delivered to the contractors upon such estimate. Underwood and Green were to procure subscribers to this underwriting agreement, by which the subscribers were to take from the contractors the bonds of the company at 90 per cent. of their par value, and also such amount of stock, as taken at par, would equal the number of bonds so purchased. To enable the company to carry out the contract, the shareholders agreed to an increase of the capital stock so that the capital stock of the company should amount to $10,000,000. Ziegler, prior to his connection with the company, had loaned to Underwood and Green the sum of $30,000 upon their note. After the maturity of the note, and after the contractors had received from the company bonds in payment of the work done in the construction of

the road, he received from the contractors payment of the note in such bonds at ninety per cent. of their par value. He also subscribed the underwriting agreement for $250,000 of the bonds of the company upon the terms of that agreement. Afterwards, at the solicitation of the president and attorney of the company and of the contractors, and in order that the subscription might be completed within the time limited, and the contractors be enabled to comply with their contract and build and equip the line as therein agreed, he subscribed for an additional $250,000 worth of bonds upon the agreement by the contractors that, in consideration thereof, they would give to Ziegler an additional bonus in stock received by them in payment of the contruction of the road of $125,000 at its par value. These facts were known to the president and attorney of the company at the time, and the proposition therefor was made in their presence, and they knew, and Ziegler was at the time assured, that the contractors had offered such terms to others, who had and would accept thereof, and so the underwriting agreement would be fully executed within the time limited. This was a matter wholly between the contractors and Ziegler, and in no way affected the rights of the company under the contract. The underwriting agreement was thereby completed, and the contractors enabled to proceed with the construction of the road. The stock received by Ziegler under the underwriting agreement was sold by him in July, 1894, at 18 cents upon the dollar,—a price above its market value. Ziegler at the time of suit owned 400 bonds of the company, of which 8 had then recently been purchased by him in the open market, 145 purchased by him of the company in the year 1894 at 52 cents on the dollar, and the remaining 247 were part of the 500 bonds received by him under the underwriting agreement at 90 cents on the dollar. The bonds purchased of the company were not the bonds delivered by the company to the contractors, but were part of those reserved by the company, all of which were sold by the company to different parties at the same price. At that price Ziegler purchased them at the solicitation of the officers of the company, and at a price not less than, if not greater than, their market value at the time. The other individual defendants purchased their bonds of Ziegler, being part of those received by him from the contractors under the underwriting agreement. They were bona fide purchasers thereof, for value, without notice.

On April 7, 1893, the company executed to the two corporations defendants, as trustees, its trust deed upon its road, to secure $6,500,000 of bonds, of which $5,150,000 were to be issued to Underwood and Green under their contract. This trust deed was in the usual form, except that it provided that the holders of bonds should have no right of action at law or in equity upon the bonds, except only in case of the refusal of the trustees to act. It further provided that, upon default in interest continuing for six months, the trustees might, upon request of the holders of one-fourth in interest of the outstanding bonds, and shall, if requested by the holders of a majority in interest of the outstanding bonds, declare the principal matured. It further provided that upon default in the payment of interest, and upon request of a majority in interest of the outstanding bonds, the trustees, on being indemnified, should take possession of the road. These provisions were not in curtailment of the power of the trustees upon default by the company, and of their own motion, to institute such proceedings as they might deem necessary in protection of the trust. The railroad was completed by the contractors, and on the 4th day of March, 1894, the directors of the company, by resolution, accepted possession, without prejudice to any claim that the work was not in compliance with the contract, and the company has since continued in the possession and operation of the railway. In October, 1894, the company had a settlement with the contractors, and for the balance then found due gave them its promissory notes due in January and February, 1895, and upon maturity of the notes made further claims against the contractors with respect to alleged defects in their work; whereupon a further, complete, and final adjustment was made in March, 1895, and mutual releases passed between the company and the contractors. The company paid the interest upon these bonds up to January 1, 1895, paying the interest then due on the bonds held by the individual defendants below in October, 1895. On January 8, 1895, the president of the company reported to a meeting of its stockholders that the

company could not pay the interest upon its mortgage debt, there being a deficit therein of $146,725.75; that to meet the interest upon its bonds would require an increase of 90 per cent. in the traffic of the company, which was impossible within its territory; that the situation was serious and pressing; and he requested that a committee of stockholders be appointed to confer with a committee of bondholders to devise some plan of readjustment by which foreclosure would be avoided. A committee was accordingly appointed, and in March, 1895, a plan was devised and proposed to the bondholders that they should scale their bonds to 60 per cent. of their face value. The plan contemplated a deposit of the bonds by the bondholders with a trustee, the holders to receive the debentures of the company for 60 per cent. of the par value of the bonds. Ultimately, and upon the assent to the plan of all bondholders, the debentures were to be surrendered, 40 per cent. of the face value of the bonds was to be canceled, and the owners to receive back their bonds at 60 per cent. of their face value; also to receive an income bond of the company for 15 per cent. of the face value of their bonds, the interest upon which was noncumulative, and was payable only out of the income, and after the payment of all fixed charges upon the road. The debentures were to be guarantied by the Northwestern Elevated Railroad Company, which guaranty was to be extended upon surrender of the debentures to the bonds so scaled to 60 per cent. The proposed guarantor was a company having a franchise, but no road or equipment, and then indebted to an amount not disclosed; the guaranty to be given in consideration of a right of way over a portion of the complainant's railway. The plan involved no contribution by stockholders, nor any scaling or surrender of stock. Until this plan should receive the assent of all, the bonds of assenting bondholders were to be held simply as security for the debentures to be issued, but was to be effective, and the debentures were to be issued upon the assent of the holders of 3,800 of the 7,474 bonds. More than the necessary number assented to warrant the issue of the debentures, the officers of the company owning or controlling the larger number of the bonds. Holders of bonds in the amount of $6,694,000 assented to the plan, and deposited their bonds as proposed, and received the debentures of the company; but holders of bonds to the amount of $780,000, including the individual defendants, declined to or have not assented to the plan. The company paid the interest on the debentures due July 1, 1895, but made default in the payment of interest upon the bonds of holders not assenting to the plan. On January 27, 1896, the complainant below filed its motion to remand the cause to the state court upon the ground that the court was without jurisdiction to hear and determine the cause, because there is not in the suit a controversy which is wholly between citizens of different states, and which can be fully determined as between them; and that no process was issued in the suit by the state court, and there was no controversy therein by the defendants, or either of them, and they had not submitted themselves to the jurisdiction of the state court. This motion was, on March 16, 1896, overruled by the court. The cause came on for final hearing on the 12th day of July, 1898, when a decree was passed dismissing the bill without prejudice to the complainant's right to assert the matters alleged in its amended bill by way of defense, or by cross bill to the bill exhibited by the Farmers' Loan & Trust Company against the Lake Street Elevated Railroad Company and others since the commencement of this suit, for the foreclosure of the trust deed executed by the complainant. From this decree both parties appeal, the complainant below assigning for error that the court erred in entertaining jurisdiction and in refusing to remand the cause to the state court, and also that the court erred in dismissing the bill and in declining to enter a decree for the complainant. The defendants assign for error that the court erred in dismissing the bill without prejudice, and in not dismissing it for want of equity.

Charles H. Aldrich, for complainant.

John J. Herrick, I. K. Boyesen, and Levy Mayer, for defendants.

Before WOODS and JENKINS, Circuit Judges, and SEAMAN, District Judge.

JENKINS, Circuit Judge, after the foregoing statement of the case, delivered the opinion of the court.

The question which must first engage our attention touches the jurisdiction of the court below and the propriety of the removal of the cause from the state court. The complainant was a citizen of the state of Illinois. All of the defendants were citizens of other states, with the exception of the American Trust & Savings Bank, one of the trustees under the trust deed, which was a citizen of the state of Illinois. By section 2, Act March 3, 1887 (24 Stat. 552, c. 373, § 2, cl. 3), as amended by Act Aug. 13, 1888 (25 Stat. 434, c. 866), it is provided that any suit of a civil nature of which the courts of the United States are given jurisdiction by the act, brought in the court of any state, the defendants being nonresidents of the state in which the suit is brought, may be removed into the federal court of the proper district; "and when in any suit mentioned in this section there shall be a controversy which is wholly between citizens of different states and which can be fully determined as between them, then either one or more of the defendants actually interested in such controversy may remove said suit into the circuit court of the United States for the proper district." Several cases have arisen in which the supreme court has passed upon and construed this statute. The summing up of the whole contention is, we think, well and accurately stated in Mr. Carter's recent work on the Jurisdiction of Federal Courts as Limited by Citizenship and Residence of the Parties.

"In the case of mere formal parties, if the action can be maintained as between the other parties to the suit, the fact that formal parties are joined as complainants or defendants, between whom and the opposing parties the requisite diversity of citizenship does not exist, will not oust the court of jurisdiction. In cases of this character the only question is as to who may be considered merely formal parties. In chancery proceedings the supreme court has divided parties into three classes: (1) Formal parties, who have no interest in the controversy between the immediate litigants, but have such an interest in the subject-matter as may be conveniently settled in the suit and thereby prevent further litigation; (2) necessary parties, who have an interest in the controversy, but whose interests are separable from those of the parties before the court, and will not be directly affected by a decree which does full and complete justice between them; (3) indispensable parties, who not only have an interest in the subject-matter of the controversy, but an interest of such a nature that a final decree cannot be made without either affecting their interests or leaving the controversy in such a condition that its final determination may be wholly inconsistent with equity and good conscience. Formal parties may be made parties or not, at the option of the complainant. Necessary parties must be made parties if practicable, in obedience to the general rules which require all persons to be made parties who are interested in the controversy, in order that there may be an end to litigation; but this general rule in the national courts is subject to the exception that, if such parties are beyond the jurisdiction of the court, or if making them parties would oust the jurisdiction of the court, the suit may proceed to a final decree between the parties before the court, leaving the rights of the absent parties untouched and to be determined in any competent forum. Indispensable parties must, of course, be made parties, and the court cannot proceed without them."

The bill here affected certain bonds and stock of the complainant company, which were alleged to be held by the individual defendants, and which it was charged were obtained by Ziegler in fraud

of the duty which he owed to the complainant as a director, and under the circumstances stated in the bill. The validity of the trust deed and of the contract with Underwood and Green were not attacked, nor was the validity of the stock and bonds in question impugned. But it was said that, because of the supposed violation of duty by Ziegler, who acquired the stock and bonds of the contractors and certain of the bonds from the company while he was a director of the company, he, and the other individual defendants who received their bonds from him with notice of the circumstances, ought justly to account to the company for the bonds and stock held by them, respectively, and to surrender to the company such bonds and stock upon repayment to them by the company of the amount respectively paid by them therefor. The trustees under the trust deed, one of whom was a citizen of the state of Illinois, of which state the complainant was also a citizen, were made parties defendant to obtain against them an injunction pendente lite restraining them from taking possession of the road and from commencing suit at law upon the bonds or in equity to foreclose the trust deed by reason of default of the company in the payment of interest upon the affected bonds at the solicitation or upon demand of the individual defendants. No decree was sought against the trustees, or other relief demanded against them. It is quite clear that these trustees were not necessary parties to the suit, because they had no interest in the controversy, and certainly no interest separable from that of the individual defendants. They were either indispensable parties or merely formal parties. These trustees were appointed in the interest of all the bondholders to protect the mortgage security, and upon default to take measures to subject it to sale in payment of the amount which should be found due upon the bonds. They were not the holders or owners of the bonds and stock in controversy, nor had they any interest therein. It was matter of indifference to them whether the complainant or the individual defendants should be adjudged entitled to these bonds. If the complainant should, by decree, become the owner of the bonds and stock upon repayment to the individual defendants of the amount they paid therefor, the bonds and stock would be valid bonds and stock in its hands, the bonds still secured by and entitled to the protection of the trust deed, and both bonds and stock subject to resale by the company. The controversy, therefore, in no way affected the validity of the bonds, and in no way lessened the legal estate in the property which, by the trust deed, was vested in the trustees. They had no possible interest in the controversy, and were not indispensable parties to it. They were merely formal parties, made such to prevent them by injunction pendente lite from complying with the demand of the individual defendants to proceed to execute the trust because of the default of the company. They were under no obligation to comply with such demand, because, under the terms of the trust deed, the individual defendants were not the holders of a sufficient number of bonds to require the trustees to put into execution their powers. They might, of their own motion, proceed to foreclose for the default, but that duty was not rendered impera-

tive by the demand of the individual defendants, and they are only sought to be enjoined from compliance with that demand, and not from exercise of their discretion. The controversy could be wholly determined without their presence. They were merely formal parties, and the community of citizenship of the bank, trustee, with the complainant cannot oust the federal court of jurisdiction.

This conclusion, we think, is supported by the decisions of the ultimate tribunal. In Walden v. Skinner, 101 U. S. 577, 25 L. Ed. 963, a bill was filed against the principal defendant to reform a deed executed to a deceased person, and to declare a trust with respect to the land conveyed. The executors of such deceased person, who were citizens of the same state with the complainant, were also made defendants, that they might be compelled, upon decree declaring the trust, to convey the title derived by them from such deceased person. It was held that they were merely formal parties to the suit, and, jurisdiction as between the complainant and the principal defendant being undoubted, that jurisdiction could not be defeated by the joinder of formal parties whose citizenship was the same as that of the complainant. In Barney v. Latham, 103 U. S. 205, 26 L. Ed. 514, a citizen of Minnesota and a citizen of Indiana brought suit against citizens of New York, Massachusetts, and Wisconsin, and a land company, a citizen of Minnesota. An accounting was sought with respect to moneys received by the individual defendants upon the sale of certain lands, in which it was claimed the ancestors of the complainants were interested, and also with respect to like lands which the individual defendants had caused to be conveyed to the land company, that that company should convey to the complainants their proportionate interest in the land. It was held that there was a separable controversy between the complainant and the defendant company, which could be determined, as between them, without the intervention of the land company; and that the suit was, therefore, properly removable. In delivering the opinion of the court, Mr. Justice Harlan observes (pages 214, 216, 103 U. S., and page 518, 26 L. Ed.):

"We have endeavored to show that the land company was not an indispensable party to the controversy between the plaintiffs and the defendants, citizens of New York, Wisconsin, and Massachusetts. Whether those defendants and the land company were not proper parties to the suit, we do not now decide. * * * A defendant may be a proper, but not an indispensable, party to the relief asked. In a variety of cases it is in the discretion of the plaintiff as to whom he will join as defendant. Consistently with the established rules of pleading, he may be governed often by considerations of mere convenience; and it may be that there was or is such a connection between the various transactions set out in the complaint as to make all of the defendants proper parties to the suit, and to every controversy embraced by it. * * * We are of the opinion that, upon the filing of the petition and bond of the individual defendants in the separable controversy between them and the plaintiffs, the entire suit, although all of the defendants may have been proper parties thereto, was removed to the circuit court of the United States. and that the order remanding it to state court was erroneous."

In Bacon v. Rives, 106 U. S. 99, 1 Sup. Ct. 3, 27 L. Ed. 69, an accounting was sought by the complainant against the principal defendant, as between whom the federal court had undoubted juris-

diction. The other defendants, who had like citizenship with the complainant, were trustees of an estate in which the principal defendant was interested, and the bill asked for a decree against the defendant's trustees for the amount of the principal defendant's interest in the estate, in satisfaction, in whole or in part, of the part which might be adjudged against the principal defendant upon the accounting. The court held that, while the trustees were proper parties to the suit, they were neither indispensable nor necessary parties, and jurisdiction of the federal court was not devested by their joinder. We are referred to several cases in the supreme court which are supposed by counsel to hold a different doctrine, and to establish that the trustees here are indispensable parties to the suit. We think that the effect of these decisions has been misconceived. Corbin v. Van Brunt, 105 U. S. 576, 26 L. Ed. 1176; Winchester v. Loud, 108 U. S. 130, 2 Sup. Ct. 311, 27 L. Ed. 677; Thayer v. Association, 112 U. S. 717, 5 Sup. Ct. 355, 28 L. Ed. 864; Crump v. Thurber, 115 U. S. 56, 5 Sup. Ct. 1154, 29 L. Ed. 328; Insurance Co. v. Huntington, 117 U. S. 280, 6 Sup. Ct. 733, 29 L. Ed. 898; Brooks v. Clark, 119 U. S. 502, 7 Sup. Ct. 301, 30 L. Ed. 482; Torrence v. Shedd, 144 U. S. 527, 12 Sup. Ct. 726, 36 L. Ed. 528; Wilson v. Oswego Tp., 151 U. S. 56, 14 Sup. Ct. 259, 38 L. Ed. 70; Merchants' Cotton-Press & Storage Co. v. North American Ins. Co., 151 U. S. 368, 14 Sup. Ct. 367, 38 L. Ed. 195. Whether one is an indispensable party, or a mere formal party, depends upon the case made; and a brief reference to the facts in each of these cases will, we think, establish that the decisions are in accord with the principle herein asserted.

In Corbin v. Van Brunt the action was in ejectment by citizens of the state of New York against a corporation of the same state, and individual defendants, residents of other states, to recover possession of certain premises in the state of New York. As shown by the court, there was no sort of separable controversy authorizing a removal of the cause.

In Winchester v. Loud, one of two grantors, both citizens of Michigan, filed his bill against three trustees, two of whom were citizens of Michigan, and one of whom was a citizen of Massachusetts, and against the other debtor, a citizen of Michigan, and the holder of the debt, a citizen of Massachusetts, asking for an accounting by the trustees with respect to property conveyed to them in trust to secure the debt, for a removal of two of the trustees, and, upon payment of the debt, for a conveyance of property conveyed in trust. It was held there was no separable controversy. The statement of the case is all-sufficient to show its irrelevancy to the case in hand.

In Thayer v. Association the parties in a trust deed given to secure a debt brought suit against the trustee and the claimant of the debt, alleging that the trustee was proceeding to sell the property conveyed in trust for nonpayment of the debt secured thereby; that the debt had in fact been paid, and sought a decree so adjudging, a release of the mortgaged property from the trustee, and that the sale be enjoined. The trustee was a citizen of the state of which

the complainants were citizens. It was held that the federal court had no jurisdiction, and that the trustee was an indispensable party to such a suit. The legal title of the trustee was sought to be extinguished, and that could not be done in a suit to which he was not a party.

In Crump v. Thurber the complainant brought suit against a corporation of the state of which he was a citizen, and against others, residents of other states, to declare certain stock of the corporation standing in the name of one of the defendants, and held by another of the defendants, to be owned by the complainants, and that the corporation defendant cancel upon its books the shares so standing in the name of the defendant, and issue to the complainant certificates for such shares. To such a suit the corporation was an indispensable party, and jurisdiction was rightly denied.

In Insurance Co. v. Huntington the complainant, a citizen of New York, brought in a state court of the state of Ohio a creditors' bill to obtain satisfaction of his judgment out of the incumbered real estate of the debtor by a sale and distribution of the proceeds among the lienholders. One of the lienholders, a citizen of the state of Pennsylvania, answered to the suit, claiming a first lien upon the incumbered property, and asking that the property be sold, and the proceeds first applied to the payment of its mortgage, and then sought to remove the case from the state court into the federal court on the ground of a separable controversy. The court held that there was no separable controversy; that the purpose of the suit was a decree subjecting the property to sale discharged of all incumbrances, and the distribution of the proceeds among the various lienholders according to priority of the various liens as they should be determined by the court; that there was but a single cause of action, to wit, an equitable execution of a judgment against the property; that the cause of action was indivisible, and that, while there might be separate defenses, these did not constitute separate controversies, within the meaning of the act; that the issue presented by the separate answers was merely an incident to this main contention. This case is without relevancy to the one before us.

In Brooks v. Clark there was a joint cause of action against two defendants, one of whom had community of citizenship with the plaintiff, and after judgment in the state court was let in to defend, and then sought to remove the cause to the federal court. There was no separable controversy, and neither defendant was a formal party.

In Torrence v. Shedd the complainant brought suit in partition against over 90 defendants, claiming title to an undivided one-third through conveyance by one Sorin, and seeking to have assigned to all the tenants in common their shares in severalty. Most of the defendants answered, denying the title of plaintiff, and asserting title in themselves. Afterwards Sorin was allowed to intervene and answer and to file a cross bill, asserting that the complainant's title was held in trust for the cross complainant; that the plaintiff had, in violation of his trust, refused to reconvey to Sorin, but had contracted to sell to one Brown. He sought a decree, and claimed an

equitable title in whatever of the land should be set off to the plaintiff. It was urged that this controversy between the complainant and Sorin presented a separable controversy, which could be wholly determined as between them, and that the case was, therefore, properly removable into the federal court. But it was held otherwise, Mr. Justice Gray, speaking for the court, declaring (page 532, 144 U. S., page 728, 12 Sup. Ct., and page 532, 36 L. Ed.):

"The object of the suit was not merely the establishment of the title of the plaintiff in an undivided share of the land, but it was the partition of the whole land, and the conversion of his undivided share into an entire estate in a proportional part, as well as the establishment of his title against all the defendants. The controversy between the plaintiff and Brown and Sorin related only to the title claimed by the plaintiff in an undivided share. Sorin's whole claim was of an equitable estate in whatever should be set off to the plaintiff, and the other defendants denied that either the plaintiff or Brown or Sorin had any title whatever. Neither of the three, therefore, could recover judgment setting off to him any share in the land without establishing a title, not only as between themselves, but also as against all the other defendants. The inevitable result is that the controversy of the plaintiff and Brown with Sorin was merely incidental to the main object of the suit, could not be determined as between them without the presence of the other defendants, and did not constitute such a separate controversy as would justify a removal into the circuit court of the United States."

This case certainly does not bear upon the one before us.

In Wilson v. Oswego Township a suit was brought by one claiming to be the owner of certain bonds which had been deposited with a bank to be held in trust for him, and to be delivered to him upon the completion by him of certain work. The complainant sought for the delivery of the bonds to him in pursuance of the trust deed. It was held that the bank, being bailee and trustee of the bonds, was an indispensable party, as, of course, it was.

In Merchants' Cotton-Press & Storage Co. v. North American Ins. Co. the case is thus stated in the report:

"A railroad company agreed with a cotton-compress company that the latter should receive and compress all the cotton which the railroad might have to transport in compressed condition, and that it should insure the same for the benefit of the railroad company, or of the owners of the cotton, for a certain compensation, which the railroad company agreed to pay weekly. It was further agreed that the compress company, on receiving the cotton, was to give receipts therefor, and that the railroad company, on receiving such a receipt, was to issue a bill of lading in exchange for it. Cotton of the value of $700,000, thus deposited with the compress company for compress and transportation, was destroyed by fire. That company had taken out policies of insurance upon it, but to a less amount, in all of which the compress company was named as the assured, but in the body of each policy it was stated that it was issued for the benefit of the railroad company or of the owners. The various owners of the cotton further insured their respective interests in other insurance companies, called in the litigation the 'Marine Insurance Companies.' After the fire, the amounts of the several losses were paid to the assured by the several marine companies. In an action in the courts of Tennessee to settle the rights of the parties, the supreme court of that state held (Lancaster Mills v. Merchants' Cotton-Press Co., 89 Tenn. 1, 14 S. W. 317; Demming v. Merchants' Cotton & Storage Co., 90 Tenn. 306, 17 S. W. 89) that the companies so paying were entitled to be subrogated to the rights of the owners or consignees against the railroad company under its bill of lading, and that the railroad company was entitled to have the insurance which had been taken out by the compress company collected for its benefit. The railroad company not being party to those suits, the marine insurance

companies filed their bill in equity in a state court in Tennessee against the compress company, the several persons who had insured the destroyed cotton for it, and the railroad company, to reach and subject the fire insurance taken out by the compress company for the benefit of the railroad company, and for other relief set forth in the bill. The plaintiffs in the suit were a corporation under the laws of Pennsylvania, a corporation under the laws of New York, and a corporation under the laws of Rhode Island, on behalf of themselves and of all other companies standing in like position. On the other side were two corporations under the laws of Pennsylvania, two corporations under the laws of Great Britain, a corporation under the laws of New York, certain residents of Rhode Island, certain citizens of New York, certain citizens of Tennessee, two aliens, and forty-four insurance companies of West Virginia, Pennsylvania, New York, Illinois, Louisiana, Wisconsin, Alabama, Connecticut, Ohio, Texas, Indiana, and Great Britain. The defendants petitioned for the removal of the cause to the circuit court of the United States, on the ground that the controversy was wholly between citizens of different states, or between citizens of one or more of the several states and foreign citizens and subjects, and that the same could be fully determined as between them. The petition was denied, and the cause proceeded to judgment in the state court."

The opinion is exhaustive upon the facts declared, and satisfactorily establishes that both the railroad company and the compress company were indispensable parties to the suit, and that, therefore, the case was not removable. We have not been able to perceive that the ruling there in the slightest degree antagonizes the ground upon which the question here presented must be determined, but, as we think, inferentially affirms our position.

We have thus reviewed, possibly at unnecessary length, the cases in the supreme court having relation to the subject of removal of a separable controversy, and they confirm us in our opinion that in the case before us the only controversy is between the complainant and the individual defendants, and that, while it may have been proper enough to join the trustees as parties defendant, they were not indispensable or necessary parties to the bill, but merely formal parties, without whose presence the right as between the complainant and the individual defendants could be fully determined; and that the presence of the trustees as parties defendant cannot, because of the community of citizenship of one of them with the complainant, oust the federal court of jurisdiction. The refusal of the lower court to remand the cause was consequently correct.

This conclusion brings us to the questions presented upon the merits of the case. We are not advised by the records of the considerations which led the court below to dismiss the bill without prejudice to the right of the complainant to assert, in the foreclosure suit brought by one of the trustees to foreclose the trust deed, by answer or cross bill, the matters alleged in the present bill. It is manifest that neither party desired such disposition of the case, since both have appealed from the decree. Both parties had presented to the court, by pleadings and by proofs, their respective claims, and a full hearing was had. There would seem to be no good reason to remand the parties against the wishes of each to further litigation, or why the matter in dispute should not have here final determination upon the merits.

Two propositions are presented to our consideration by counsel for the Lake Street Elevated Railroad Company in support of the

contention that a decree should have been rendered in favor of the complainant below, which we will consider in their order. It is firstly contended that the $725,000 of stock which Ziegler received from Underwood and Green, the contractors, pursuant to the underwriting agreement, and which had been issued by the company under the contract between them and the company for the construction of the railway, was so issued in violation of section 13, art. 11, of the constitution of the state of Illinois, repeated in chapter 114, § 21, par. 22, of the statutes of that state (3 Starr & C. Ann. St. 1896, p. 3236). This provision is as follows:

"No such corporation shall issue any stock or bonds, except for money, labor or property actually received and applied to the purposes for which such corporation was organized. All stock dividends, and other fictitious increase of the capital stock or indebtedness of any such corporation, shall be void."

This clause of the constitution has received construction by the supreme court of the state in Railroad Co. v. Thompson, 103 Ill. 187. It was there held that the object of the provision "was to prevent reckless and unscrupulous speculators, under the guise or pretense of building a railroad, or of accomplishing some other legitimate corporate purpose, from fraudulently issuing and putting upon the market bonds or stocks that do not and are not intended to represent money or property of any kind, either in possession or in expectancy; the stock or bonds in such case being entirely fictitious. But it was not intended by that provision to interfere with the usual and customary methods of raising funds by railroad companies by the issue of their stock or bonds for the purpose of building their roads, or of accomplishing other legitimate corporate purposes." This construction was approved by the supreme court of the United States in Railroad Co. v. Dow, 120 U. S. 287, 7 Sup. Ct. 482, 30 L. Ed. 595, where a similar constitutional provision of the state of Arkansas was considered. There it was claimed that the bonds issued by the railway company were void because issued in contravention of the constitutional provision. The entire issue of bonds, amounting to $2,600,000, and the entire issue of stock, amounting to $1,300,000, were given in consideration of the conveyance to the company of the property of a predecessor company, bought by the trustees under a mortgage foreclosure. The value of the property conveyed did not exceed the par value of the stock so given, and the contention was that the $2,600,000 of bonds were given without consideration received in money or property, and so within the prohibition of the constitution. This court overruled this contention, and held the bonds valid. Mr. Justice Harlan, speaking for the court (page 298, 120 U. S., page 487, 7 Sup. Ct., and page 600, 30 L. Ed.), says:

"The prohibition against the issuing of stock or bonds, except for money or property actually received or labor done, and against the fictitious increase of stock or indebtedness, was intended to protect stockholders against spoliation, and to guard the public against securities that were absolutely worthless. One of the mischiefs sought to be remedied is the flooding of the market with stock and bonds that do not represent anything whatever of substantial value. In reference to a provision in the constitution of Illinois adopted in 1870, containing a prohibition, as to railroad corporations, similar to that imposed by the Arkansas constitution upon all private corporations, the supreme court of the former state, in Railroad Co. v. Thompson, 103 Ill. 187, 201, said: 'The latter part of the clause of the constitution in question,

which declares that all stocks, dividends, and other fictitious increase of the capital stock or indebtedness of such corporation shall be void, we think clearly points out the chief object which the constitutional convention sought to accomplish in adopting it; and to this we must look, in a large degree, for a solution of the language which precedes it. The object was, doubtless, to prevent reckless and unscrupulous speculators, under the guise or pretense of building a railroad, or of accomplishing some other legitimate corporate purpose, from fraudulently issuing and putting upon the market bonds or stock that do not, and are not intended to, represent money or property of any kind, either in possession or expectancy, the stock or bonds in such case being entirely fictitious. * * *' Under this provision of the constitution, railroad companies have no right to lend, give away, or sell on credit their bonds or stock, nor have they right to dispose of either, except for a present consideration, and for a corporate purpose." "Recurring to the language employed in the Arkansas constitution, we are of opinion that it does not necessarily indicate a purpose to make the validity of every issue of stock or bonds by a private corporation depend upon the inquiry whether the money, property, or labor actually received therefor was of equal value in the market with the stock or bonds so issued. It is not clear, from the words used, that the framers of that instrument intended to restrict private corporations—at least, when acting with the approval of their stockholders—in the exchange of their stock or bonds for money, property, or labor upon such terms as they deem proper; provided, always, the transaction is a real one, based upon a present consideration, and having reference to legitimate corporate purposes, and is not a mere device to evade the law and accomplish that which is forbidden. We cannot suppose that the scheme whereby the appellant acquired the property, rights, and privileges in question for a given amount of its stock and bonds falls within the prohibition of the state constitution. The beneficial owners of such interests had the right to fix the terms upon which they would surrender those interests to the corporation of which they were to be the sole stockholders."

These cases speak authoritatively to us the construction to be given the constitutional provision under consideration and the principle upon which we are to determine whether the facts here involved place the issue of stock in question under the ban of the constitutional provision. The subscription by Miller antedated the contract between the company and Underwood and Green by some months. He was, without doubt, pecuniarily irresponsible. We are not informed of the object and purpose of his subscription, but the fact of his pecuniary irresponsibility does not, of itself, render void the stock issued thereon. It is a circumstance to be considered in connection with all the facts of the case to ascertain whether that stock was issued without consideration, and was fictitious. His subscription was approved, and the notes he was to give therefor were later on accepted by the board of directors upon the condition that the contractors would accept the notes as so much paid upon the contract for the construction of the road. We are not advised of the transaction as between the contractors and Miller, but presumably they received from him the stock, and the bill so treats the fact to be. The transaction was probably a device to carry into effect the prior subscription of Miller, and to transfer the stock to the contractors in part payment of their work on account. This conclusion is fortified by the fact that the original capital stock amounted to $5,000,000, of which $3,500,000 had been issued, and the balance was unissued, and represented by the Miller subscription; and that, to carry out the contract with Underwood and Green, the stockholders of the company voted to increase the capital stock to $10,000,000, and, as

the contractors were to receive under their contract $6,500,000 of stock, that amount was made up of the increase of stock and the amount subscribed by Miller. The pecuniary irresponsibility of Miller cannot, therefore, as we think, affect the question, since that stock was issued in consideration of the work performed by the contractors, and was applied as so much paid on the contract The like result follows with respect to the stock issued to Underwood and Green. It was issued in payment of work done under contract, their subscription thereto in May, 1893, being merely formal, and to enable the issuing of stock to them for work done.

It is urged that the value of the road constructed did not exceed $3,500,000, and that the contract was improvident, and is presumed to be fraudulent. We cannot concur in this contention. In the straitened condition of the company at the time of the contract the directors seemed to have done the best they could to procure the construction of the road upon as favorable terms as could be obtained. The contract appears to have been made in entire good faith upon their part. With $3,500,000 of stock and $812,000 of bonds outstanding, but one mile of the road had been constructed, and the company was without means to continue the enterprise. They bargained fairly with the contractors with respect to the price to be paid. That price cannot be measured by the face value of the bonds and stock to be received by the contractors. The stock was manifestly of but little, if any, value, and that purely speculative. The bonds were comparatively valueless until completion of the road, and, although disposed of by the contractors under the underwriting agreement at 90 cents on the dollar, had, after the completion of the road, a market value of but 52 cents on the dollar. If any one has lost by the transaction, it is not the complainant company, but those who, under the underwriting agreement, and for the purpose of carrying out a public enterprise, invested their money in these bonds at a price in excess of their real value. This is not, we think, a case of fictitious and speculative issue of stock without consideration, within the meaning of the constitutional provision, as construed in the cases quoted. It possibly may be better in the long run if the law should provide that all subscriptions of stock could be paid only in cash. This would doubtless prevent the floating of wild and chimerical schemes by which loss is entailed upon a community. But it must not be forgotten that men will not invest large capital in speculative and hazardous enterprises without being assured that, in case of success, they shall receive a profit corresponding relatively to the risk assumed. Whatever may be the correct solution of the problem, the law does not require payment of subscription of stock to be in cash. It may be paid for in work, labor, material, or service rendered. We sit to declare, not to make, the law, and are unable to condemn the transaction in question as within the ban of the constitutional provision.

But if this were otherwise, and the constitutional provision denounces this issue of stock, the act was ultra vires the corporation, and the stock was void, not merely voidable. Bank v. Kennedy, 167 U. S. 363, 17 Sup. Ct. 831, 42 L. Ed. 198. It had no validity in the

hands of a bona fide purchaser for value, without notice. The complainant has not suffered pecuniary injury by its issue, and cannot call upon Ziegler to account for what he received upon its sale, for that would be to affirm a void transaction; to both reprobate and approbate.

It is further urged by the Lake Street Elevated Railroad Company that, where default has occurred in the payment of a large bonded indebtedness, and an overwhelming majority of the bondholders desire to prevent foreclosure through some scheme of reorganization or by scaling the bonds, it is competent for a court of equity, to whom the minority bondholders have applied for relief, to ascertain the interest of such minority holders in the property and secure the same to them without foreclosure and sale. We need not, in the present case, assent to or dissent from the proposition in the general terms in which it is stated, for there are several sufficient reasons which render the suggestion immaterial to the case in hand. No bondholder has here applied to the court for affirmative relief. The action is by the debtor to declare certain bonds and stock to have been improperly acquired by one of its directors. Its bill suggests no such state of facts as are involved in the proposition, and seeks relief upon no such predicate. It doubtless is true that a court of equity, taking upon itself in foreclosure proceedings the administration of a public enterprise, will view favorably, and lend all proper aid to, a plan of reorganization which is fair and just. But no such case is presented by this bill. It was broadly suggested at the bar that upon the facts disclosed the time was ripe and the occasion fit for a court of equity to take a step in advance, and to declare that it could rightly determine the propriety of a scheme of reorganization, and compel recalcitrant bondholders to comply with it. This is certainly a startling proposition, suggesting a wide departure from precedent, and a great enlargement of equity power. If the case before us were one in which the proposition could be properly considered, it might be suggested that every one interested in an enterprise must determine for himself whether he will continue in it or abandon it; that a creditor must determine for himself whether he shall abate his claim or contend for the full amount. While a court of equity will not lend a helping hand to an importunate creditor to exact an inequitable demand, it may be suggested that here we are asked by the corporation debtor to compel a minority of the bondholders to scale their bonds, and to accept but 60 per cent. of the face value of the bonds upon the same security now held for their face; the additional guaranty proposed, if not ultra vires the proposed corporation guarantor, being, upon the facts disclosed, of doubtful value, if not wholly worthless. In addition to this, the stockholders of the Lake Street Elevated Railroad Company, who proposed this scheme, and in whose interest we are asked to enforce it, designed to make no sacrifice on their part in placing the company in a position to meet its obligation. If the scheme should be assented to, and should prove successful, the bondholders would abate at least 25 per cent. of their debt, which would inure to the benefit of the stockholders. In view of the further fact that, as it

is said, the assenting bonds are held or controlled by the directors of the company, we should hesitate to declare that the scheme so abounds with equity that a chancellor should delight to render it his aid and assistance if it were fit for him in any case to exercise the powers of a court of equity for the enforcement of a scheme of reorganization. This, however, is not such a scheme, but the mere proposal of a debtor to its creditors to compromise the debt.

Upon the whole, we are of the opinion that the complainant's case is without merit, and that its bill should have been dismissed upon the merits. The appeal of the Lake Street Elevated Railroad Company is denied. The appeal of the defendants to the bill is sustained. The decree is reversed, and the cause is remanded to the court below, with directions to enter a decree dismissing the bill for want of equity; the costs of both appeals to be taxed against the complainant below.