### POLLITZ v. WABASH R. CO. et al.

#### (Circuit Court, S. D. New York. February 6, 1909.)

**1. RAILROADS (§ 143*)—RAILROAD COMPANIES—CONSOLIDATED COMPANIES—LAWS GOVERNING.**

A consolidated railroad company formed by a consolidation agreement between corporations of different states, which remain in existence, may not disregard the laws of any one of such states, except as to matters to which the consent of the state is necessarily implied from the fact that it authorizes such consolidations.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 448; Dec. Dig. § 143.*]

**2. RAILROADS (§ 15*)—CORPORATIONS—INCREASE OF PREFERRED STOCK—LAW OF MISSOURI.**

Const. Mo. art. 12, § 8 (Ann. St. 1906, p. 304), provides that the stock of a corporation shall not be increased "except in pursuance of general law nor without the consent of the persons holding the larger amount in value of the stock first obtained." Section 10 (Ann. St. 1906, p. 305) provides that "no corporation shall issue preferred stock without the consent of all the stockholders." Rev. St. Mo. 1899, § 962 (Ann. St. 1906, p. 860), provides that "any corporation may increase its capital stock * * * with the consent of the persons holding the larger amount in value of the stock," etc. Section 1050 (Ann. St. 1906, p. 908) permits railroad companies to issue preferred stock with the consent of all the existing stockholders. *Held,* that under such provisions a railroad company which has authorized and issued preferred stock with the consent of all the stockholders may increase the same with the consent of the holders of the majority of the stock, no distinction being made in that respect between common and preferred stock.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 31; Dec. Dig. § 15.*]

**3. CONSTITUTIONAL LAW (§ 15*)—CONSTRUCTION OF CONSTITUTIONAL PROVISIONS—GENERAL RULES.**

In construing the provisions of the Constitution of a state, as in construing its statutes, all the provisions on the same subject are to be read together as one whole and given such a meaning as will avoid conflict and at the same time carry out the plain intent and promote the objects for which intended.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. § 9; Dec. Dig. § 15.*]

**4. RAILROADS (§ 15*)—CORPORATIONS—INCREASE OF STOCK—VALIDITY.**

Defendant railroad company, which was a consolidation of corporations of different states, had an issue of debenture bonds, the interest on which was payable only from net earnings. Shortly after its organization, owing to a large increase of business and competition in the coun-

---

try, and to the requirements of national and state laws, it became necessary to the successful operation of its lines to make large and continuous expenditures upon its tracks, equipme. :, and terminal facilities. As a result of devoting earnings to such purposes, no interest was paid on the debentures, and the holders thereof, who were entitled to vote as stockholders, opposed such use, claiming it to be illegal, and the controversy finally resulted in litigation which threatened a receivership. It also became necessary, to meet the increasing requirements of its business, for the company to obtain a large amount of new capital by increasing its stock and bond issues, which the debentures and the litigation over the same prevented. In such situation the stockholders voted an increased issue of stock and a new issue of bonds, and ratified an agreement with the debenture holders to exchange for their bonds new bonds and common and preferred stock aggregating in amount considerably more than the face value of such bonds. *Held*, that such agreement was not ultra vires and void as in conflict with the provision of Const. Mo. art. 12, § 8 (Ann. St. 1906, p. 304), which was binding on the company, that "no corporation shall issue stock or bonds except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void," the proposed new stock and bonds issued for such exchange not being either fictitious nor without adequate consideration.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. § 31; Dec. Dig. § 15.*] .

5. CORPORATIONS (§ 66*)—INCREASE OF STOCK—RIGHTS OF STOCKHOLDERS—ESTOPPEL.

A stockholder who placed his objection to an issue of new stock by the corporation on certain specific grounds is estopped to change his position and allege new grounds of objection after the stock has been issued and sold and after he has instituted litigation to have such stock declared illegal.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. § 180; Dec. Dig. § 66.*]

In Equity.

This, a consolidated action (Law, 7,091, and Law, 27), seeks to enjoin defendants from carrying out an alleged scheme or plan for the retirement of certain debenture bonds amounting to $30,000,000, issued by the Wabash Railroad Company in July, 1889, and which plan and agreement was entered into about August 15, 1906, by said company and a committee of the bondholders of said company, and completed in October following, and to have same declared illegal, and to have all bonds and common and preferred stock issued and used or applied in execution of such plan or scheme declared illegal, and a restoration, etc., decreed.

Stephen M. Yeaman (Abram J. Rose and Alfred C. Pette, of counsel), for complainant.

Rush Taggart, Lawrence Greer, and F. C. Nicodemus, Jr., for defendant Wabash R. R.

William C. Trull, for defendants Evans, Pomeroy, and Cumming.

Alexander & Green (Wm. W. Green, of counsel), for defendant Mercantile Trust Co.

Davies, Stone & Auerbach, for defendant United States Mortgage & Trust Co.

Pierce & Greer, for defendants Pierce, Otteson, Jeffrey, Terry, Gallaway, and Hubbard.

Thompson, Vanderpoel & Freedman, for defendant Bowling Green Trust Co.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

RAY, District Judge. The bills of complaint in two actions, amended bills, cross-bill, answers, and replications present a confused mass of allegations and denials; but these with the evidence, and its exhibits in extenso, and extensive briefs, which make little attempt to simplify by pointing out the salient features, may, it seems to me, establish the following facts:

1. The defendant the Wabash Railroad Company is a foreign consolidated corporation existing under the laws of the states of Ohio, Indiana, Illinois, Michigan, and Missouri, and came into existence under the following circumstances and consolidation agreement: In 1889 certain lines of railroad in said states owned by certain corporations which were then passing through receivership and reorganization were conveyed to a purchasing committee, which committee, after acquiring such railroads, caused separate corporations to be formed, one in each of said states and under the laws thereof, and then conveyed to such corporations, respectively, the line or lines of railroad situated in the state in which it was incorporated. Thereupon these five corporations entered into an agreement of consolidation, executed in July, 1889, by the officers of such companies, whereby a new and a consolidated corporation was formed known as "the Wabash Railroad Company." These lines extend from Toledo in the east, to Chicago, St. Louis, Kansas City, and Omaha, and the present system includes some 2,500 miles of main line in a competitive territory.

2. In its essentials such plan and agreement of reorganization provided for: (a) A capital stock of $52,000,000, of which $24,000,000 was preferred stock, consisting of 240,000 shares of $100 each, and $28,000,000 was common stock, consisting of 280,000 shares of $100 each. (b) A board of directors of 13 members, which might be increased to any odd number not exceeding 15 by the board with the consent of a majority of the stockholders, with power to appoint a president, first and second vice presidents, and such other officers as might be required, and power to establish and amend by-laws, one of which should fix the time and place of the annual meetings of the stockholders and debenture bondholders of the consolidated corporation. One half of the highest even number of the board was to be nominated by debenture bondholders and the other half by the stockholders, and these, so nominated, were to agree upon the odd member who was to be president of the company, and, they failing to agree, such odd member was to be nominated by the trustee of the debenture mortgage. The by-laws were to fix the manner of making such nominations, and also the manner in which the voting powers of the debenture bondholders should be exercised. These provisions as to the voting powers of debenture bondholders had no application to the first board of directors, as such debenture bonds were not issued. (c) The issue of first-mortgage bonds to the amount of $34,000,000, secured by mortgage on all the lines of the company. (d) The issue of second-mortgage bonds to the amount of $14,000,000, secured by mortgage on the lines of the company. And (e) the issue of debenture bonds to the amount of $30,000,000, bearing interest at 6 per cent. per annum, payable semiannually, and perpetual, but dependent upon the income

for interest, which should not be cumulative, and with voting powers at the rate of one vote for each $100, and with provisions in said bonds and the mortgages securing same as provided in the agreement of reorganization dated July 15, 1885; and $3,500,000 of such bonds were preferred as provided in such agreement. The holders of shares of preferred stock were entitled to a dividend of 7 per cent. per annum on their par value from the earnings of the consolidated corporation before any dividend was paid on the common stock; but after the payment of 7 per cent. dividend to the preferred stock, in any one year, the holders of that stock were not to receive anything more from the earnings of the company for that year until a dividend of 7 per cent. on the par value of the shares of common stock had been paid, and after that time all dividends were to be distributed alike to the holders of the preferred and the holders of the common stock.

3. At a meeting of the stockholders of the Wabash Railroad Company held at Toledo, in the state of Ohio, on the 1st day of August, 1889, forms of mortgages to secure the said first, second, and debenture bonds respectively were presented and duly approved, and at such meeting the officers of the company were directed to execute and deliver the mortgages and issue the bonds secured thereby.

4. The mortgages were executed and delivered, and in accordance with the provisions of the debenture mortgage, which was the junior lien, mortgage bonds were issued thereunder to the said amount of $30,000,000, $3,500,000 of which were designated as "Series A," and were preferred over the others of that issue with respect to the payment of interest, and $26,500,000 of which were designated "Series B." The agreement of consolidation, as we have seen, provided for an issue of $30,000,000 of debenture bonds, $3,500,000 of which were to be preferred, but it was silent, as was the resolution adopted at Toledo, Ohio, August 1, 1889, as to what particular statute should govern their issue. This debenture mortgage was executed in the city and state of New York, August 15, 1889, to the Mercantile Trust Company, a corporation of the state of New York, and the trustee for the bondholders designated in such mortgage.

5. The agreement of consolidation provided that five originals thereof should be executed, and one filed in each of said states. By-laws were adopted which provided that the regular annual meeting of the stockholders and debenture bondholders for the election of directors should be held in the city of Toledo, state of Ohio, on the second Tuesday of October each year. The by-laws also provided for special meetings, and that these should be held in the said city of Toledo.

6. To carry into effect the provision as to the nomination of directors by the debenture bondholders, section 2 of the by-laws provided that those present in person, or by proxy, at each annual meeting should meet together in such manner as they should adopt and elect six persons to be voted for for directors; that the stockholders should do the same; that the names of such twelve persons so selected should be reported to the annual meeting; that they or a majority of them should thereupon meet together and agree upon the other or thirteenth person to be voted for as a director, but, in case they failed to agree,

that the person designated by the trustee of the debenture bondholders should be reported to the meeting, and that such persons so reported should constitute the regular ticket to be voted for as directors; that if the said thirteenth person so reported was elected he should be president, unless otherwise ordered or voted by a majority of all the members of the board. In case of failure to nominate in the above manner, then the stockholders and debenture bondholders were to nominate thirteen persons for directors, or they might adjourn the meeting to some future day.

7. The first and second mortgage bonds, $48,000,000, draw interest at the rate of 5 per cent. annually, and are payable 50 years from May 1, 1889, and February 1, 1889, respectively. Each of the debenture bonds acknowledges an indebtedness of $1,000, and the Wabash Railroad Company thereby promises to pay that sum, with interest thereon at the rate of 6 per cent. per annum, payable semiannually January 1st and July 1st, each year, in the year 1939.

(a) This interest is to be paid "from the net income of said railroad company ascertained and declared by its board of directors to be applicable to such interest payments, as provided by the terms of the mortgage securing payment hereof."

(b) "Such interest shall not be cumulative, and no part thereof unpaid in any year from the income of that year shall be paid from the income of any other year."

(c) "The railroad company gives to the registered holder hereof, and will secure to him, so far as it lawfully may, the right to cast one vote for each one hundred dollars par value hereof, at all meetings of its stockholders."

Each bond also states that the $3,500,000 of series A "shall be first entitled to interest payments from the income of each year, as aforesaid, and shall so far have a first lien on the earnings of said total issue, and shall also be redeemable by said railroad company at par at any time within twenty years from the date of their issue, after five years from such date," on the publication of a notice of intention to redeem.

Also, "Series B, of the aggregate par value of $26,500,000, shall be entitled to interest payments from such part of the net income of each year as may be so declared applicable after payment of interest for that year on bonds of series A."

Also, "the holder of any bond of series B may defer payment of the principal by failure to demand the same when due, and interest thereon, as if said bond had not matured, shall then be payable until said principal is paid upon demand."

8. The debenture mortgage contains the following in regard to ascertaining and declaring the amount of net income applicable to the payment of interest on such debenture bonds, viz.:

"The party of the first part, in the months of June and December in each and every year until said bonds are fully paid, shall cause its board of directors to ascertain and declare the amount of net income applicable to the payment of interest on the bonds secured hereby. Such amount shall be ascertained by deducting from the gross earnings of said company all current expenses for operating said railroad and such sums as in the judg-

ment of said board of directors may be necessary to maintain and renew said road and its equipment and appurtenances and to keep the same in good condition and to increase its equipment to such extent as may be commensurate with its business requirements, and to pay taxes, rentals, interest and sinking fund installments accrued or to accrue on any and all mortgages existing on the property hereby conveyed, and to satisfy all liens and charges thereon that are or may be prior in equity to this mortgage.

"From the net income thus ascertained the said board of directors shall first set aside an amount sufficient to pay, on the first day of the month next following, interest at the rate of six per cent. per annum and for a period of six months on all the outstanding debenture bonds of the series 'A' secured hereby. If the said net income shall not be sufficient to pay such interest in full then it shall be wholly applied so soon as it amounts to one per cent. of said bonds toward such interest payment. If said net income shall exceed said amount needed for payment of interest as aforesaid on the outstanding debenture bonds of series 'A,' the said board of directors shall next set aside from the excess an amount sufficient to pay on the first day of the month next following, interest at the rate of six per cent. per annum, and for a period of six months, on all the outstanding debenture bonds of the series 'B,' secured hereby, and if said excess shall not be sufficient to pay such interest in full, then it shall be wholly applied so soon as it amounts to one per cent. of said bonds towards such interest payment."

9. Differences arose between the management of the Wabash Railroad Company and certain of the debenture mortgage bondholders as to the proper construction of the provision for ascertaining and declaring the amount of net income applicable to the payment of interest on the debenture bonds, and such differences to a greater or lesser extent continued down to the time of the execution of the agreement for the retirement of such debenture bonds.

10. As before stated, the lines of railroad owned by the consolidated company, the Wabash Railroad Company, run through rich and highly competitive sections of country, and soon after the organization of said company it was demonstrated that there was in this territory as well as throughout the United States an increased industrial development, constantly growing, which brought unforeseen demands upon this company as well as others for increased trackage and terminal facilities, for modern equipment and other improvements, which demands became more urgent as higher standards of efficiency came to be established and demanded by competing lines and by federal and state legislation. This is matter of common knowledge, and proof is hardly required to establish such facts. Large expenditures of money were required to make these improvements and necessary extensions. The earnings were insufficient to meet all demands for developments and improvements, and only those were made which were most urgent and could be made within the provisions of the debenture mortgage. With the debenture mortgage and debenture mortgage bonds outstanding, it was impossible upon any reasonable terms to raise money upon a security or lien junior to the first, the second, and the debenture mortgages. Attempts were made to interest capitalists in such a security, but these attempts were without successful result. These matters and difficulties were frankly stated in one or more of the annual reports to the stockholders and debenture mortgage bondholders.

11. The holders of the debenture bonds have claimed the right to control the property of the company to the exclusion of the stockhold-

ers; also the right to vote at all meetings of stockholders casting one vote for every $100 par value of debenture bonds; and also that the debenture bonds of series B are or may be made, at the option of the holders thereof, a perpetual lien upon the surplus or net income of the company.

12. The continued application of the revenues of the company to certain of the purposes hereinbefore mentioned, consisting of necessary improvements, betterments, etc., met with the disapproval of certain holders of debenture mortgage bonds, who claimed and insisted that expenditures for such purposes could not be made out of earnings without violating the provisions of the debenture mortgage to which attention has been called. The greater the demands upon the company for improvements which had to be made, the more acute were the differences between the managemnt and the debenture mortgage bondholders.

13. In 1905, a committee of the holders of the debenture mortgage bonds of series B was formed, and this committee was charged with the duty of demanding an accounting for revenues alleged to have been diverted to improvements not authorized by the debenture mortgage. Negotiations were had, but proved unsuccessful, and the Mercantile Trust Company, as trustee mentioned in the debenture mortgage, commenced a suit for an accounting in the Circuit Court of the United States for the Eastern district of Missouri. Broad and sweeping charges were made in the bill of complaint, and the demand for relief was such that a long and expensive litigation was impending, in which was involved a construction of the provisions of the debenture mortgage and an examination of all the acts of the management of the company. It was apparent that, should the suit be successful and a decree entered in favor of the Mercantile Trust Company for even a substantial part of the revenues of the company applied during the preceding 17 years to betterments and improvements, a receivership would follow and disaster result. To avert this, negotiations were opened with all concerned, and these negotiations for an adjustment of differences resulted in the making of an agreement or the adoption of a plan to which wide publicity was given, and which was substantially as follows: After reciting most of the pertinent facts, the appointment of a committee to represent the debenture mortgage bondholders, and the assent of that committee, and the desires and purposes of the railroad company and its propositions, the agreement or plan dated August 15, 1906, and signed by the Wabash Railroad Company by E. T. Jeffery, chairman of the board, and by Henry Evans, Henry K. Pomeroy, and George M. Cumming, as committee representing the debenture mortgage bondholders, amongst other things, stated:

"Subject to authorization and approval by the stockholders and debenture mortgage bondholders of the railroad company, by appropriate corporate action in accordance with the provisions of law applicable thereto, of this agreement, and of all action herein provided to be taken on the part of the railroad company, the railroad company agrees that, in case not less than 95% face value of said debenture bonds, series B, now outstanding, shall be deposited with the United States Mortgage and Trust Company (hereinafter called the 'Trust Company'), in the city of New York, under this agree-

ment, within sixty days from the date of the publication of the plan of exchange by the committee as provided in article 2 hereof, or such extended or lesser period as may be agreed upon between the committee and the railroad company, it will issue and deliver in exchange therefor the following amounts of new securities upon the issue of the same:

"For each $1,000 debenture mortgage bonds, series A, of the railroad company, $775 par value in new bonds, $500 par value in preferred stock, and $560 par value in common stock.

"For each $1,000 par value of debenture bonds, series B, $700 par value in new bonds, $500 par value in preferred stock, and $500 par value in common stock of the railroad company. Scrip will be issued in adjustment of fractional amounts."

This plan or agreement contained other provisions which it is unnecessary to recite, unless it may be incidentally. It had been approved at a meeting of the directors held June 11, 1906.

14. June 29, 1906, the board of directors passed a resolution to increase the preferred capital stock by $16,500,000, to consist of 165,000 shares of the par value of $100 each, and to increase the common capital stock by $81,500,000, to consist of 815,000 shares of the par value of $100 each, subject to the assent and approval of the stockholders of the company in the manner provided by law, and, upon the increase being made, the proper officers were authorized to issue an amount of the preferred stock not exceeding the amount of said increase, and an amount of the presently authorized but unissued common capital stock, not exceeding the sum of $16,500,000, "for the purpose of effecting the exchange of the debenture mortgage bonds upon the terms set forth in the agreement and submitted to the meeting and approved by the board."

15. October 22, 1906, the plan was submitted to a meeting of the stockholders and debenture bondholders, held at Toledo, Ohio, and adopted by over 90 per cent. of those present and voting, and the bill of complaint states that this was the most largely attended meeting in the history of the company. At this meeting the following was adopted:

"Resolved, that the agreement dated August 15, 1906, heretofore entered into by this company, with Henry Evans, Henry K. Pomroy and George M. Cumming, as a committee, in the form submitted to this meeting, be, and the same is hereby in all respects, authorized and approved, and the board of directors of this company be, and it is hereby, authorized and empowered to take any and all action thereunder which may be necessary or proper to effect the exchange of the debenture mortgage bonds of the railroad company, as contemplated in said agreement, upon such terms and conditions as may be authorized and approved by said board of directors, with power in said board of directors to enter into any contracts or agreements with bankers for the underwriting of the new securities issuable in exchange for said debenture mortgage bonds, upon such terms and conditions as said board of directors may approve, and to cause such notice to be given of the terms of such exchange, as it may deem necessary, and to determine whether or not the plan for such exchange shall be and become effective."

16. On the 18th day of June, 1906, there was issued to James Pollitz, the complainant here, and registered in his name June 19, 1906, a certificate for 1,000 shares of the common stock of the Wabash Railroad Company, which shares of stock he says he purchased on the 13th of that month. It is the ownership of this stock that confers

on the complainant his only interest in the questions involved, and he brings this suit as such owner of such common stock of the company.

17. At the said special meeting of the stockholders and debenture bondholders of the Wabash Railroad Company, held at Toledo, Ohio, October 22, 1906, said complainant, by his proxy and attorney, presented and caused to be entered on the minutes of the meeting the following notice, objections, and protest, viz.:

"The Stockholders and Debenture Mortgage Bondholders of the Wabash Railroad Company, in Special Meeting Assembled at Toledo, Ohio, October 22, 1906, Pursuant to a Call Signed by the President and Secretary of Said Company, Dated New York, August 16, 1906—Take Notice:

"The undersigned, the holder of one thousand shares of the common capital stock of the Wabash Railroad Company, hereby protests against any action being taken at this meeting, or any adjournment thereof, by the stockholders or debenture mortgage bondholders of that company, which attempts or purports to authorize, in any manner or to any extent, the carrying out of the plan to issue new four per cent. fifty-year mortgage bonds and preferred and common stock of the company in exchange for the debenture mortgage bonds as set forth in the call for this meeting, and the explanatory circular issued by the president and secretary of said company under date of September 8, 1906, for the following reasons, among others:

"(1) In the circular issued by the said company under date of September 8, 1906, it is proposed to issue to the holders of $30,000,000 mortgage debenture bonds, upon which interest is payable only if earned, and upon $26,500,000 of which no interest has ever been paid, $21,262,500 of the proposed new four per cent. fifty-year mortgage bonds, $15,210,000 of preferred stock and $15,210,000 of common stock, or new bonds and stock to the amount of $51,682,500 to retire the $30,000,000 of debenture bonds, and to the extent of $21,682,500 the new stock will be fictitious, without consideration and void.

"(2) The Constitution of the state of Missouri provides that capital stock can only be issued for money paid, labor done or property actually received, and that all fictitious increase of stock is void, and the laws of the other states wherein said company is incorporated, to wit: Ohio, Indiana, Illinois, Michigan and Iowa provide that capital stock can only be issued at par for money or property at its fair value.

"(3) The said proposition alters the position of the present stockholders in the following respects, among others:

"(a) The changing of a noncumulative, nonpaying bond, the principal of which does not become due until 1939, into a bond with a fixed interest charge, which, if not paid, will subject the property to foreclosure and the capital stock to extinguishment.

"(b) It places ahead of the present common stock $15,210,000 of preferred stock, upon which dividends of seven per cent. must be paid before the common stock may receive anything, and to the extent of $6,472,500 the proposed issue of preferred stock will be without any consideration, thus diluting that class of stock and depreciating the value of both the preferred and common stock.

"(c) It is proposed to issue $15,210,000 of common stock without consideration, thereby diluting and making less valuable the present common stock.

"(4) The debenture mortgage bondholders are disqualified to vote upon this proposition, which contemplates their advantage and enrichment to the injury of the present stockholders, and changing the position of the mortgage bonds from a noncumulative, nonpaying security to that of a foreclosable mortgage bond with a definite fixed charge.

"I respectfully request that the foregoing protest be entered in full upon the minutes of this meeting, and it is herewith handed to the secretary for that purpose.  James Pollitz,

"By his Proxy and Attorney.

"Toledo, Ohio, October 22, 1906.  Stephen M. Yeaman."

18. Thereafter, and on the 26th day of October, 1906, at a meeting of the stockholders and debenture bondholders, the following was adopted:

"Whereas, the capital stock of this company is insufficient and it is necessary that the same be increased to the amount hereinafter stated for the construction of its road, the construction of a second additional track, the extension of its line and the construction of branches thereof, the increase of its machinery, rolling stock or other fixtures, each and all of which has become necessary for the speedy and convenient transaction of its business, and also for the purpose of paying bonds issued or guaranteed by it, or for the liquidating or paying any unfunded or floating debt, or for the purpose of extending its line of railroad and constructing branches thereof, and for each and all of the purposes aforesaid:

"Resolved, that the authorized capital stock of this company be, and the same is hereby, increased by the amount of $98,000,000, which increase shall consist of 980,000 shares of the par value of $100 each, of which 165,000 shares shall be preferred stock and 815,000 shares shall be common ,stock, so that the total authorized capital stock of this company, of all classes, shall be $200,000,000, consisting of 2,000,000 shares of the par value of $100 each, and of which capital stock 405,000 shares shall be preferred stock and 1,595,-000 shares shall be common stock.

"Further resolved, that the proper officers of this company be, and they are hereby, authorized and empowered to make such certificates and payments and take such other action as may be necessary in order to effect the increase of the authorized capital stock of this company provided for by the foregoing resolution."

On the same day, at a meeting of the board of directors of the Wabash Railroad Company, a resolution was adopted reading as follows:

"Resolved, that the authorized capital stock of the company be, and the same is hereby, declared to be increased to the amount of ninety-eight million dollars ($98,000,000), such increase consisting of 165,000 shares of preferred stock and 815,000 shares of common stock, making the total authorized capital stock of the company, of all classes, two hundred million dollars ($200,000,000), par value, consisting of 405,000 shares of the par value of $100 each of preferred stock and 1,595,000 shares of the par value of $100 each of common stock."

19. December 22, 1906, at a meeting of the board of directors, a report was made that there had been deposited, under such plan and agreement, of debenture bonds, series A, $2,824,000, and of series B, $19,995,000, and promised, $852,000. Thereupon the promised bonds were accepted, and the plan and agreement was declared operative.

20. The exchange of bonds and securities was to be made through the defendant United States Mortgage & Trust Company, and the defendant Mercantile Trust Company, was to countersign the certificates for capital stock as issued.

21. The defendant George I. Gould, is a director of the Missouri-Pacific Railway Company, and he and said company and its other directors are large holders of said debenture mortgage bonds, and it is alleged that they would be greatly benefited by the proposed exchange.

22. Upon this state of facts, and after proceedings were in motion for carrying into effect the said plan and agreement, Pollitz commenced the first of these consolidated actions in the Supreme Court of the state of New York on the 10th day of November, 1906, whence it was removed to this court, and thereafter, and after the commencement

of the second action in the Supreme Court of the state of New York, for the same cause, with added allegations, about January 15, 1907, which was also removed to this court, such actions were consolidated. About November 26, 1906, Pollitz commenced a similar suit, based on the same facts, in the circuit court of the state of Missouri, in which a motion for an injunction against carrying said plan into execution was asked for and denied. Thereafter that action was dismissed, but not on the merits. A little later a similar suit for the same cause, on the same facts, was commenced in the same court, accompanied by a temporary restraining order, which was subsequently discharged, and that suit is still pending.

23. There was certain correspondence between Pollitz and the officers of the Wabash Railroad Company following the meeting of October 22, 1906, bearing on the good faith of Pollitz, which I have not deemed necessary to set forth here. That may be referred to later. As early as September 20, 1906, Pollitz objected to the plan, and wrote that unless it was abandoned he should institute proceedings. Nor have I gone at length into his purchase of the common stock now standing in his name. It is doubtful that he obtained same for any purpose other than to embarrass and block the execution of such plan. It seems almost incredible that reading the papers containing notices and editorials as to these transactions, as he says he did, he failed to understand the situation and pending propositions and their progress. He says he had money with C. H. Venner & Co.; that C. H. Venner, whose wife is his cousin, purchased the stock for him, representing the company in so doing; that he left the stock with Venner & Co. for safe-keeping, where it has ever since remained, except when taken away for purposes of this suit. The defendants do not admit such ownership by complainant, and demanded strict proof. Pollitz says he saw the stock was low, and his only object in purchasing was he thought it would go up a few points. His recollection as to the delivery, etc., is quite hazy, as is his recollection of what he read in the papers.

24. No interest has ever been paid on the debenture mortgage bonds of series B, and, since 1904, no interest has been paid on those of series A.

25. Since the issue of such first, second, and debenture mortgage bonds, the Wabash Railroad Company has acquired various other railroad properties of great value, and the floating indebtedness of the company has been largely increased.

26. The new proposed mortgage is to cover or include all these new properties, etc.

27. The complainant, of all the stockholders and debenture mortgage bondholders, was the only one who voted against the proposed plan and agreement contemplating the retirement of such debenture bonds. The complainant contends that:

"(10) That the said plan of retiring said debenture bonds was unlawful, unauthorized, and contrary to the laws of the states under which the defendant railroad company was organized, and was ultra vires the corporation, and unjust, inequitable, and injurious to the plaintiff and all other stockholders of said company similarly situated, in that the said debenture mort-

gage bonds were to be paid or retired by the delivery to the holders thereof of $1,955 par value of new securities for each $1,000 of bonds; series A, and of $1,760 of new securities for each $1,000 of bonds, series B, making a total amount of $53,482,500 of new bonds and preferred and common stock to be issued for the retirement of, or in exchange for, the $30,000,000 of debenture bonds, the result being that for $23,482,500 of its capital stock the defendant railroad company would receive nothing whatsoever.

"(11) That, in addition, $15,810,000 of preferred stock would be placed ahead of the common stock then outstanding, upon which dividends of 7% must be paid before the common stock could receive anything, and to the extent of $7,672,500 the proposed issue of preferred stock would be without consideration. That, besides, $15,810,000 par value of common stock would be issued without any consideration, thereby diluting and making less valuable the common stock outstanding.

"That the proposed plan would result in changing a noncumulative, nonpaying bond the principal of which does not mature until 1939 into a bond with a fixed interest charge, which if not paid would subject all the properties of the defendant railroad company to foreclosure and its capital stock to extinguishment.

"That interest at the rate of 4% upon $21,862,500 new mortgage bonds which would be issued under said plan would, during the next thirty-three years, the life of the debenture mortgage bonds proposed to be retired, amount to $28,858,500; an amount nearly sufficient to retire and pay at their maturity, in 1939, the $30,000,000 of outstanding debenture bonds, whereas, if the debenture bonds were allowed to remain outstanding, the requirements of the defendant railroad company for extensions, improvements, new equipment, and betterments, would be met out of the net earnings of the said company, with no obligation to pay interest on the outstanding debenture mortgage bonds unless there should be a surplus of net earnings over and above all the requirements of the company for the purposes aforesaid."

The defendant the Wabash Railroad Company files its cross-bill setting up these and other alleged facts, and demands not only a dismissal of the bill of complaint, but affirmative relief, that its acts and the proposed plan be declared lawful and proper under all the circumstances, and that complainant be enjoined from commencing other and similar actions as vexatious and unfounded, and from further questioning the legality and validity of the proposed action under such agreement.

The Wabash Railroad Company, while a consolidated railroad company recognized in the law, is not an entity in the sense of a company consolidated from one or more companies under the statutes of a single state, and which may, and generally does, become a new company, the old ones passing out of existence. While engaged in interstate commerce, having continuous lines running through or into the several states mentioned, it is not incorporated as "The Wabash Railroad Company," under any federal law or under the law of any one state. It exists as "The Wabash Railroad Company" by virtue of the consolidation agreement, such consolidation being sanctioned by the laws of the states mentioned permitting its corporations to consolidate with those of adjoining states, where they form continuous lines. The several consolidated corporations remain intact, and each is subject to the laws of its creation; but the consolidated company may hold its meetings for the transaction of business, election of directors, etc., in any one of the states, even if the laws of a particular state require the meetings of the corporation to be held within the state, and its acts are legal and binding upon all. The consent of the

state to the consolidation necessarily implies a consent to the doing of such acts as are essential to the life, existence, and carrying on of business by the consolidated company. However, the consolidated company may not disregard the laws of any one of the states except so far as an assent is necessarily implied. It certainly cannot act in violation of the Constitution of either one of such states. See Muller v. Dows, 94 U. S. 444, 447, 24 L. Ed. 207; Ashley v. Ryan, 153 U. S. 436, 14 Sup. Ct. 865, 38 L. Ed. 773; Graham et al. v. Boston, H. & E. R. R. Co., 118 U. S. 161, 169, 6 Sup. Ct. 1009, 30 L. Ed. 196; Noyes on Incorporate Relations, c. 10, §§ 99–105.

The Constitution of the state of Missouri, art. 12, § 8 (Ann. St. 1906, p. 304), provides:

"No corporation shall issue stock and bonds, except for money paid, labor done, or property actually received, and all fictitious increase of stock or indebtedness shall be void. The stock and bonded indebtedness of corporations shall not be increased, except in pursuance of general law, nor without the consent of the persons holding the larger amount in value of the stock first obtained at a meeting called for the purpose, first giving sixty days' public notice as may be provided by law. * * * Section 10 (Ann. St. 1906, p. 305). No corporation shall issue preferred stock without the consent of all the stockholders."

The statutes of the state (sections 962, 963, and 1050, Rev. St. Mo. 1899 [Ann. St. 1906, pp. 860, 861, 908]) provide for and authorize an increase of the capital stock of corporations. Section 962 is general in its nature, and says:

"Any corporation may increase its capital stock or its bonded indebtedness with the consent of the persons holding the larger amount in value of the stock, which consent to such increase shall be obtained at a meeting of the shareholders called for that purpose, sixty days notice of the time and place of such meeting and of the amount of the proposed increase of stock or bonded indebtedness having been given as hereinafter provided," etc.

The Constitution says that no corporation shall "issue" preferred stock without the consent of "all" the stockholders, while the statute says in effect that once issued any corporation may "increase" its capital stock on the consent of the persons holding the larger amount in value. Section 1050, which relates to the issue of preferred stock is, to me, confusing. So far as pertinent, that section reads:

"Any railroad company organized under the laws of this state may issue a preferred stock for such amount, and upon such terms and conditions, as the board of directors may prescribe. But before any issue of such preferred stock shall be made, the question of issuing the same, together with the terms, conditions and privileges upon which the same is proposed to be issued, shall be submitted to a vote of the stockholders of said company, at a regular annual election for the directors thereof, or at a special meeting of the stockholders of said company called to consider the same, if at such election all the stockholders shall consent. At all elections called to consider the question of issuing preferred stock, as provided in this section, no person shall be permitted to cast any vote as a proxy for the owner of any share or shares of stock without he shall produce written authority, signed by the owner thereof."

Whether the words "if at such election all the stockholders shall consent" refer to the submission of the question of issuing preferred stock at such an "election," in which case, if all stockholders consent-

ed to submit the question, there would be an implied assent to the result of the vote, or to the words, "Any railroad company * * * may issue a preferred stock," etc., in which case the question of the issue of preferred stock would require the affirmative vote of every stockholder voting, is a question. If the first construction prevails, Pollitz assented to the proposition to increase the capital stock and to increase the preferred stock, for he assented to the submission of the question to the meetings referred to, and consented thereby to be bound by its action so far as increasing and thereupon issuing the preferred stock is concerned. If the second is the true construction of the statute, then Pollitz did not consent, and we are brought to the question whether the constitutional and statutory provisions relate to and prohibit increases of preferred stock, the issue of preferred stock having been once authorized by a vote of all the stockholders and such stock issued, or only to the original authorization of the issue of preferred stock and the issue thereof.

It will have been noted that the Wabash Railroad Company in the very beginning of its existence and operations and in the consolidation agreement provided for and issued $24,000,000 of preferred capital stock, and it is shown and presumed that the consent of all the stockholders was duly given to the issue of preferred capital stock, and to this amount at least. The issue of preferred stock was thus authorized by the consent of all the stockholders. The constitutional provision, section 8, quoted, specifically speaks of and permits increases of the capital stock, the issue of which is once authorized, as do the statutory provisions referred to and in part quoted. In speaking of and specifically authorizing increases or an "increase" of capital stock, neither the Constitution nor the statute in terms limits such increases or increase to common stock, but presumably refers to all the capital stock theretofore authorized and issued, and hence expressly permits an increase of any and all capital stock theretofore authorized and issued, whether preferred or common, on "the consent of the persons holding the larger amount in value of the stock first obtained at a meeting called for the purpose." I think it was the purpose of the people and of the Legislature of Missouri in adopting these provisions to restrict corporations in adopting the policy of issuing preferred stock by making the assent of all the stockholders a prerequisite, but that it was not their intent to so limit the increase of such stock, the policy having been duly adopted by the corporation. This seems to have been the interpretation put upon the Constitution by the Legislature of the state, for it said, in section 962, "Any corporation may increase its capital stock or its bonded indebtedness with the consent of the persons holding the larger amount in value of the stock," etc., and did not limit such increase so made on such consent to common, or nonpreferred, stock, nor does the Constitution itself. Had the intent been to so limit the increase of capital stock, I think the section would have read, may increase its "nonpreferred capital stock" or "its capital stock not preferred," or "common stock."

In construing the provisions of the Constitution of a state, as in construing its statutes, we are to read all the provisions on the same subject together as one whole, and give such a meaning as will avoid

conflict and at the same time carry out the plain intent—promote the objects for which intended. We are not to adopt either a loose or an unduly strict construction, or one that we would give to a private contract, but a reasonable one, having in mind the grounds sought to be covered, and the evils, if any, sought to be remedied, and the objects sought to be attained. Legal Tender Case (opinion by Mr. Justice Gray) 110 U. S. 421, 439, et seq., 4 Sup. Ct. 122, 28 L. Ed. 201; Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23; 8 Cyc. 729, 730, and numerous cases there cited.

We come, then, to consider whether or not this agreement or plan was ultra vires the company and void because in violation of the provisions that "no corporation shall issue stock or bonds except for money paid, labor done, or property actually received, and all fictitious increases of stock or indebtedness shall be void." Of the justice and wisdom of this provision there can be no question. This company has largely increased or extended its lines, its trackage, its terminal facilities, its rolling stock, etc., and has vastly improved those it had at an expense of millions of dollars, all of which has added to the value of its property. Much of this was compulsory and inevitable, growing out of general industrial growth, national and state prosperity, demands for increased and improved facilities, competition which the company must meet, and added requirements demanded by both state and national laws. These have not come gradually, keeping pace with the increased earnings of the road. They spring up suddenly, sometimes on every hand, and required and require vast outlays of money. Stock or shares of stock represent the capital invested in the enterprise—its property, and property rights and franchises. In the beginning almost, and in the midst of all this, this company found itself confronted by, and, so to speak, incumbered with, its first and second mortgage bonds, and incumbered and hampered and embarrassed in all its financial dealings by these debenture mortgage bonds, the existence of which was a constant source of annoyance and dispute, and of threatened, and at one time actual, litigation. The plan in question here was evolved and agreed upon as a way, if not the way, out of difficulties. I find no suggestion in the record or basis for a claim that there is or was any proposition to issue and give away either stock or bonds. There is to be an exchange, or both sales and exchange. As shown by the minutes of the meeting of the stockholders and debenture mortgage bondholders, held at Toledo, October 22, 1906, the scheme and plan entire was: (1) Because of the insufficiency of the capital stock and of the necessity for an increase thereof to provide for construction of its road, a second track, the extension of its line, and the construction of branches thereof, the increase of its machinery, rolling stock and other fixtures, the payment of bonds issued or guaranteed by the company, the payment of unfunded or floating debt, and the extension of the line of the road and the construction of branches thereof, and to provide for all such purposes, that the company increase the capital stock as before stated. (2) To make provision for refunding and retiring all its outstanding indebtedness and obligations secured by liens upon any part of its property, and for paying its promissory notes and equipment obligations, including

the exchange of its debenture mortgage bonds, and for the refunding and retirement of bonds of other companies, the payment whereof had been assumed by the Wabash Railroad Company, and to provide for the permanent betterment, improvement, equipment, development, and extensions of the lines of railroad and property, and for suitable and adequate terminals and terminal facilities in connection with its road and properties, and other lawful corporate purposes, that the company create an issue of 50-year 4 per cent. bonds, describing them, in the total sum of $200,000,000, all to be equally secured and to be disposed of as set forth in the mortgage or deed of trust covering all the railroads and property of the company, and that thereafter acquired through the use of such bonds or their proceeds. And, (3) in order to retire the said debenture mortgage bonds, to make the exchange hereinbefore more specifically set forth. All these objects and purposes would seem to be legitimate and proper, and not contrary to any law, or rule of public, or state, or national policy as enunciated in the state or national Constitutions or laws.

The objection is that there is embraced in this general scheme or plan, in addition to the issue of preferred stock, which has been considered, an illegal and unwarranted proposition to give in exchange for $30,000,000 of debenture mortgage bonds, as follows:

| | | |
|---|---|---|
| For each bond of series A............................ | | $ 1,000 00 |
| The following at par value: | | |
| New bonds, 4 per cent............................ | $775 00 | |
| Preferred stock................................... | 500 00 | |
| Common stock.................................... | 560 00 | $ 1,835 00 |
| Excess at par values.......................... | | $   835 00 |
| For each bond of series B............................ | | 1,000 00 |
| The following: | | |
| New bonds at par............................... | $700 00 | |
| Preferred stock................................... | 500 00 | |
| Common stock.................................... | 500 00 | 1,700 00 |
| Excess at par values............................$ | | 700 00 |
| Making on preferred debenture bonds.................... | | 2,922,500 00 |
| On other debenture bonds............................ | | 18,550,000 00 |
| Total .......................................$ | | 21,472,500 00 |

—making substantially a gift, in stock and new bonds, it is claimed, of that amount. This, at par values, would be giving in exchange for $30,000,000 debenture mortgage bonds, $22,125,000 of new 4 per cent. bonds, and $30,900,000 of preferred and common stock, making $53,-025,000 in all. This in the exchange would reduce the estimated value of the stock to about $26 per share, counting the debenture bonds and the new bonds as each worth 100 cents on the dollar.

There is nothing "fictitious" in this proposed increase of indebtedness or stock. And I know of no objection to the retirement by a railroad company of its outstanding obligations, due or not due, by the payment of cash, or new bonds, or stock therefor. The question is, is the exchange, when an exchange is made, fair and reasonable under all the circumstances of the case, and for a consideration not grossly below the fair value of the stock or bonds given by the com-

pany to retire its outstanding obligations? Memphis & Little Rock Railroad v. Dow, 120 U. S. 287, 297, 298, 7 Sup. Ct. 482, 30 L. Ed. 595, cited, approved and followed in passing on similar provisions in other state laws; Sioux City, O. & W. R. Co. v. Manhattan Trust Co., 92 Fed. 428, 433, 34 C. C. A. 431; Toledo, St. L. & K. B. C. Co. v. Continental Trust Co., 95 Fed. 497, 517, 36 C. C. A. 155; Lake St. El. R. Co. v. Ziegler et al., 99 Fed. 114, 126, 39 C. C. A. 431; Grant et al. v. East & West R. Co. of Alabama, 54 Fed. 569, 575, 4 C. C. A. 511, distinguished Altenberg v. Grant, 85 Fed. 345, 347, 29 C. C. A. 185.

In Memphis, etc., v. Dow, supra, the entire assets of the appellant, the Memphis & Little Rock Railroad Company, consisted of the property, rights, and privileges purchased by P. D. & M. trustees at a foreclosure sale of the railroad property, and by them conveyed to the appellant on condition that the beneficial owners should receive therefor $1,300,000 in stock of the company and $2,600,000 bonds. The Constitution of the state of Arkansas provided that:

"No private corporation shall issue stock or bonds except for money or property actually received, or labor done; and all fictitious increase of stock or indebtedness shall be void."

It was admitted that "the full value of the property, rights and privileges conveyed to appellant did not exceed $1,300,000, the amount at which the capital stock was fixed," and, said the court:

"Consequently, it is argued, the $2,600,000, of bonds were issued without any consideration received in money, property, or labor, and represented a fictitious indebtedness. In other words, appellants' vendors were fully compensated for their interests by taking to themselves its entire stock."

The court, after having said:

"That amount in the stock and bonds of the appellant was the valuation placed by such owners upon their interests, after taking into account, as well the amount previously expended in the construction and maintenance of the road, as the probable value in the future of the stock and bonds to be given for a surrender of those interests"—

continued:

"We do not concur in this view of the case. It does not, we think, rest upon a sound interpretation of the state Constitution. The prohibition against the issuing of stock or bonds, except for money or property actually received or labor done, and against the fictitious increase of stock or indebtedness, was intended to protect stockholders against spoliation, and to guard the public against securities that were absolutely worthless. One of the mischiefs sought to be remedied is the flooding of the market with stock and bonds that do not represent anything whatever of substantial value. In reference to a provision in the Constitution of Illinois, adopted in 1870, containing a prohibition as to railroad corporations, similar to that imposed by the Arkansas Constitution upon all private corporations, the Supreme Court of the former state, in Peoria & Springfield Railroad Co. v. Thompson, 103 Ill. 187, 201, said: 'The latter part of the clause of the Constitution in question, which declares that "all stocks, dividends, and other fictitious increase of the capital stock or indebtedness of such corporation shall be void," we think, clearly points out the chief object which the constitutional convention sought to accomplish in adopting it; and to this we must look, in a large degree, for a solution of the language which precedes it. The object was, doubtless, to prevent reckless and unscrupulous speculators, under the guise or pretense of building a railroad or of accomplishing some other legitimate corporate purpose, from fraud-

167 F.—11

ulently issuing and putting upon the market bonds or stocks that do not and are not intended to represent money or property of any kind, either in possession or expectancy, the stock or bonds in such case being entirely fictitious. * * * Under this provision of the Constitution, railroad companies have no right to lend, give away, or sell on credit their bonds or stock, nor have they the right to dispose of either except for a present consideration and for a corporate purpose.'

"Recurring to the language employed in the Arkansas Constitution, we are of opinion that it does not necessarily indicate a purpose to make the validity of every issue of stock or bonds by a private corporation depend upon the inquiry whether the money, property, or labor actually received therefor was of equal value in the market with the stock or bonds so issued. * * * The beneficial owners of such interests had the right to fix the terms upon which they would surrender those interests to the corporation of which they were to be the sole stockholders."

In Altenberg v. Grant, supra, the statute of Kentucky expressly provided that:

"And neither labor nor property shall be received in payment of stock or bonds at a greater value than the market price at the time when the said labor was done or property delivered."

We have no such provision in the statutes or Constitution of either of the states here involved.

In Lake St. El. R. Co. v. Ziegler, at page 126 of 99 Fed., at page 443 of 39 C. C. A., the court said, speaking of the Illinois statute:

" 'No such corporation shall issue any stock or bonds, except for money, labor, or property actually received and applied to the purposes for which such corporation was organized. All stock dividends, and other fictitious increase of the capital stock or indebtedness of any such corporation, shall be void.'

"This clause of the Constitution has received construction by the Supreme Court of the state in Railroad Co. v. Thompson, 103 Ill. 187. It was there held that the object of the provision 'was to prevent reckless and unscrupulous speculators, under the guise or pretense of building a railroad, or of accomplishing some other legitimate corporate purpose, from fraudulently issuing and putting upon the market bonds or stocks that do not and are not intended to represent money or property of any kind, either in possession or in expectancy; the stock or bonds in such case being entirely fictitious. But it was not intended by that provision to interfere with the usual and customary methods of raising funds by railroad companies by the issue of their stock or bonds for the purpose of building their roads, or of accomplishing other legitimate corporate purposes.' This construction was approved by the Supreme Court of the United States in Railroad Co. v. Dow, 120 U. S. 287, 7 Sup. Ct. 482, 30 L. Ed. 595, where a similar constitutional provision of the state of Arkansas was considered."

In Sioux City, etc., v. Manhattan Trust Co., supra, it was held:

"Stock and bonds of a railroad company, issued in exchange for the stock and bonds of a former company, not shown to have been invalid, in pursuance of a reorganization scheme, which, so far as appears, was entered into in good faith by the issuing company, are not invalid, under Const. Neb. art. 11, § 5 (Consol. St. Neb. 1891, p. 72), which provides that a railroad company shall not issue stock or bonds except for money, labor, or property actually received, and that fictitious issues of stock or bonds shall be void, because at the time of the exchange the cash value of the physical property and franchises acquired by the reorganized company was not equal to the par value of its securities."

In the case now before the court the holders of the debenture mortgage bonds were not required to measure the value thereof, neither is the defendant company nor this court, by the par, or even the market,

value. We must consider not only the cash value but the voting and controlling power over the road and its management conferred thereby, and we must also consider the value and importance to the Wabash Railroad Company of having them retired, especially in view of the annoyance and litigation and disputes to which they had given rise. If these debenture bonds stood as a bar to the raising of funds for the further improvement of the road, the payment of its floating indebtedness, etc., then it was of paramount importance that they be retired. Here, as in Memphis, etc., v. Dow, supra, after continued disputes and negotiations, the stock and bonds which the owners of these debenture mortgage bonds consented and agreed to receive from the Wabash Railroad Company in exchange therefor "was the valuation placed by such owners upon their interests," not only in the money value of the debenture bonds and thereby agreed to be paid, but in the voting power and control of the railroad conferred thereby, "after taking into account as well the amount previously expended in the construction and maintenance of the road, as the probable value in the future of the stock and bonds to be given for a surrender of those interests." In view of all the facts and evidence as to this road, its indebtedness, extent, necessities, etc., the probable value of the stock and bonds and the debenture mortgage bonds, I am satisfied that the exchange was not in violation of the Constitution or laws of either of the states mentioned.

But irrespective of these considerations, by reference to the obligations of Pollitz made in writing, and which must be considered as his objection to the proposed plan, and from which the conclusion is drawn that he made no others and therefore assented to the proposed action except in so far as he objected, it is seen that he did not object to the proposed increase of the capital stock of the corporation, either preferred or common, or to the proposed issue of new bonds. He did object to such stock and bonds being issued "in exchange for the debenture mortgage bonds as set forth in the call" for the meeting, on the ground that if issued in exchange, as proposed, "to the extent of $21,682,500 the new stock will be fictitious, without consideration and void," and upon the grounds that the proposed issues and exchange would alter the position of the stockholders in that it would put certain preferred stock ahead of common stock, and that to the amount of $6,472,500 the preferred stock would be without consideration and void, and thus depreciate both the preferred and common stock; that $15,210,000 of the common stock would be without consideration and void, and thus depreciate the value of the common stock; that the debenture mortgage bondholders were disqualified to vote on the proposition which contemplated their enrichment at the expense of the present stockholders and the substitution of a foreclosable mortgage bond with a definite fixed charge for a noncumulative, noninterest paying security. It was not objected that there was no power to increase the preferred stock, and there was no objection to its increase or issue for the purposes contemplated outside of the exchange thereof for the debenture mortgage bonds. But there was no affirmative assent to the increase, and the proposition as a whole, which included the increase, met with about 1,000 negative votes out of about 8,000

cast. In the first of these consolidated actions Pollitz did not claim want of power to increase the preferred stock; that question was first presented in the complaint in the second suit. It is contended that under these circumstances Pollitz is estopped from questioning in this action the power to vote the increase of preferred stock. He voted against this proposed increase on the grounds stated, and hence it did not receive the affirmative assent of all the stockholders present and voting.

In Railway Co. v. McCarthy, 96 U. S. 258, 24 L. Ed. 693, the court held:

"(4) The doctrine of ultra vires, when invoked for or against a corporation, should not be allowed to prevail, where it would defeat the ends of justice or work a legal wrong.

"(5) Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he is estopped, after litigation has begun, from changing his ground and putting his conduct upon another and different consideration."

In the opinion, the court said:

"The question made by the company upon the Sunday law of West Virginia does not, in our view, arise in this case. We have already shown that the defendant proved upon the trial that it was impossible to forward the cattle on Sunday for want of cars. And it is fairly to be presumed that no other reason was given for the refusal at that time. It does not appear that anything was then said as to the illegality of such a shipment on the Sabbath. This point was an afterthought, suggested by the pressure and exigencies of the case.

"Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law."

This was approved. Davis v. Wakelee, 156 U. S. 690, 691, 15 Sup. Ct. 559 (39 L. Ed. 578). It is immaterial that the complainant here has not received a consideration; the railroad company has proceeded on the basis of the position taken by Pollitz and the objections made by him as the only ones, and stock and bonds have been actually issued, and many persons have changed their position.

It well may be said that having asserted the increase and issue of the stock in exchange for the debenture bonds was unauthorized because without adequate consideration, and the parties having proceeded and acted on the theory that the proposed exchange only was objected to, and having increased the stock accordingly, the complainant cannot now change his position, and, after commencing litigation, assert that the increase was ultra vires because in contravention of the Constitution of the state of Missouri.

And this court must not be understood as assenting to the proposition that the validity of this transaction or plan is determined by the laws of the state of Ohio, under which laws there can be no question that it is valid. This company, the Wabash Railroad Company, existing by virtue of the consolidation agreement sanctioned by the laws of the several states named, cannot do any act incumbering the entire property owned by it which violates the statutes or Constitution of either one of such states. It is settled law that the property of a cor-

poration is held by the directors as trustees, in a sense, for its creditors, and they are bound to manage the affairs of the corporation in the interests of creditors and stockholders, but, in the case of a public service corporation, the interests of the general public are to be considered also.

I do not find that the defendant the Wabash Railroad Company has done or is proposing to do anything that it should be restrained from doing at the suit of the complainant, and therefore the consolidated bill should be dismissed, with costs. And, it seems to me, the whole question can be settled in this suit, and that defendant railroad company is entitled to a decree that, as to the complainant, Pollitz, the plan or agreement referred to is valid and may be lawfully carried out, and also restraining him from commencing or prosecuting any other action or actions to prevent its execution. Clearly a succession of suits is unnecessary, and is detrimental to the prosperity of the road, and injurious to the stockholders and the credit of the road.

There will be a decree accordingly.